LUZ H. UMPIERRE DEL VALLE, demandante y recurrente, *v.* PEDRO TORRES DÍAZ, demandado y recurrido.

*Número:* R-82-554      *Resuelto:* 28 de junio de 1983

450

*Jaime Luciano Jiménez*, abogado de la recurrente; *Ramón Bidot Díaz*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Las partes del presente litigio contrajeron matrimonio entre sí en el 1954, bajo capitulaciones matrimoniales en que hicieron constar sus respectivos bienes privativos que aportaban al matrimonio, reservándose el derecho de administrarlos separadamente, enajenarlos y hacer negocios y adquirir otros bienes por su cuenta y sin necesidad de licencia o consentimiento de su cónyuge. No obstante, dichos cónyuges no hicieron uso de la potestad que mutuamente se reconocieron y prontamente, después de casarse, hicieron uso de los bienes y los administraron como si pertenecieran a un caudal común, aportando cada uno indistintamente su trabajo y su esfuerzo personal, habiendo incrementado el capital de manera cuantiosa hasta la fecha de su divorcio en 1979. Resolvemos que lo consignado en la escritura sobre capitulaciones y las actuaciones posteriores de los cónyuges no tuvieron otro efecto que hacer inventario de los bienes privados de cada uno y hacer reserva de unos derechos que a la postre no se ejercitaron, manteniéndose de hecho las relaciones económicas del matrimonio bajo el régimen de gananciales.

I

Doña Luz H. Umpierre Del Valle y don Pedro Torres Díaz contrajeron matrimonio en San Juan el 29 de mayo de 1954, habiendo otorgado en esa misma fecha escritura sobre capitulaciones matrimoniales en que se hizo constar lo siguiente:

(a) Que doña Luz era dueña en esa fecha de dos propiedades, a saber: (1) solar y casa de concreto de una planta en el barrio Piñas de Comerío, valorados en $14,000, gravados con hipoteca por $3,200, y (2) casa de concreto, madera y zinc, de dos plantas, en solar de doña Alfonsa Colón viuda de Cruz, en la calle Acueducto de Comerío, valorada en $4,000. Se consignó que: "Dichos bienes tienen un valor total

de DIECIOCHO MIL DOLARES ($18,000.00) y descontada dicha deuda hipotecaria, resulta un balance líquido de CATORCE MIL OCHOCIENTOS DOLARES ($14,800.00) *que aporta ella al matrimonio, para que al liquidarse la sociedad conyugal le sea reconocido y satisfecho.*" (Énfasis suplido.)

(b) Que don Pedro era a su vez dueño de los siguientes bienes: (1) establecimiento comercial de mueblería en la calle Georgetti núm. 59 de Comerío, conocido como "Torres Commercial", valorado en $37,900; (2) establecimiento comercial en la misma dirección conocido por "Restaurant El Marne", valorado en $7,900; y (3) participación en un cincuenta por ciento en la sociedad Torres & Compañía, integrada por él y su señor padre, que operaba un cine con el nombre de Teatro Cobián en un solar y edificio de la sociedad en Comerío, valorada dicha participación en $15,000. Se consignó "que luego de descontar las deudas actuales del mismo que ascienden a TREINTA Y DOS MIL OCHOCIENTOS DOLARES ($32,800.00), resulta un balance líquido de VEINTIOCHO MIL DOLARES ($28,000.00), *que aporta al matrimonio don Pedro Torres Díaz, para que al liquidarse la sociedad conyugal le sea reconocido y satisfecho*". (Énfasis suplido.)

(c) Se convino que cada uno tendría la libre administración de sus respectivos bienes "y *podr[ía]* continuar con ellos sus negocios y operaciones bancarias y comerciales a que se ha[bían] venido dedicando", sin la intervención del otro, "*pudiendo*" realizar toda clase de operaciones, inclusive adquirir toda clase de bienes y enajenarlos sin limitación alguna, y realizar toda clase de negocios y especulaciones mercantiles e industriales por su propia cuenta, sin necesidad de licencia marital ni el consentimiento del otro.

El matrimonio duró veinticinco años, habiendo quedado disuelto por sentencia de divorcio de 25 de junio de 1979. En mayo de 1980 doña Luz instó demanda contra don Pedro ante el Tribunal Superior, Sala de San Juan, que tituló

"sobre liquidación de bienes gananciales". Alegó que la escritura de capitulaciones matrimoniales tuvo como único efecto práctico señalar los bienes que cada uno aportó al matrimonio, los cuales fueron administrados conjuntamente, adquiriéndose con sus frutos numerosos bienes y valores que pertenecen a ambos. El demandado negó dichas alegaciones y fue el pleito a juicio en que se aportó abundante prueba, particularmente documental. Expedimos auto de revisión a solicitud de la demandante para examinar la sentencia recaída, que si bien reconoció la aportación y esfuerzo de doña Luz en relación con el caudal acumulado durante la vigencia del matrimonio, se negó a reconocer la existencia de un régimen de sociedad legal de gananciales, pero consideró que para evitar un enriquecimiento injusto, ella tendría derecho a un diez por ciento del capital adquirido.

A base de las determinaciones de hecho del tribunal sentenciador, y luego de estudiar y analizar cada una de las escrituras públicas y documentos que obran en los autos originales de este caso, puede establecerse la siguiente cronología de hechos.

Al comprar el 27 de mayo de 1954 un cincuenta por ciento de la empresa del Teatro Cobián, que incluía la edificación del cine y el solar en que enclavaba, el demandado quedó a deber $7,406.15 de una hipoteca que gravaba el negocio. En diciembre de 1954 constituyó una segunda hipoteca sobre su participación, en garantía de $9,000 tomados a préstamo en estas operaciones.

El 5 de julio de 1955 comparecieron ambos en escritura pública y constituyeron hipoteca sobre una propiedad en la barriada La Aldea de Comerío para garantizar un préstamo de $2,000 tomado a doña Amparo Rivera Vda. de Gómez. Es curioso que dicha propiedad, que aparece como adquirida por la demandante en agosto de 1953, es decir, nueve meses antes de casarse con el demandado, no se mencionó en la escritura de capitulaciones matrimoniales. Y es

significativo que una semana más tarde, el 12 de julio de 1955, el demandado compró a su padre la otra mitad del solar y edificio dedicado a cine, por el precio de $15,000 que no se pagó del todo, pues se retuvo una cantidad para saldar en su día una hipoteca que gravaba dicha mitad. Es forzoso preguntarse si los $2,000 tomados a préstamo a doña Amparo se invirtieron en esta transacción. La casa de la barriada La Aldea fue vendida a doña Amparo el 1 de enero de 1956, mediante escritura en que comparecieron la demandante y el demandado como dueños vendedores.

En ese mismo mes de enero de 1956 le nació un bebé muerto a la demandante, luego de un embarazo de ocho meses. Ella tenía un hijo de un primer matrimonio y el demandado tenía, a su vez, tres hijos de un matrimonio anterior. El hijo muerto fue el único fruto de la relación conyugal entre la demandante y el demandado. A partir de entonces, según concluyó el tribunal sentenciador, se inició una colaboración activa entre ambos en la administración y explotación de los negocios, que se prolongó durante los veintitrés años siguientes que duró el matrimonio. De las extensas determinaciones de hecho de su sentencia, resumimos lo que sigue.

El negocio de restaurante "El Marne", que operaba con pérdidas, fue vendido. Se pagaron las deudas y el sobrante fue invertido en otros negocios, se amplió la operación de la mueblería ("Torres Commercial") y se establecieron sucursales en Corozal y Barranquitas. La demandante trabajaba particularmente en la mueblería principal en Comerío y, al mismo tiempo, supervisaba las sucursales, recibía y tramitaba las cuentas, enviaba depósitos al banco, cotejaba los contratos de venta de todas las mueblerías y tramitaba su inscripción en los registros de los municipios correspondientes. (Determinaciones de hecho núms. 12 y 13.)

En la operación del cine participaba la familia. Se designó un administrador, pero la demandante actuaba de taquillera. En febrero del 1957 comparecieron la deman-

dante y el demandado en escritura pública e hicieron constar ser dueños del solar y edificio del cine y constituyeron hipoteca en garantía de $3,600 que tomaron a préstamo. En julio de 1958 cancelaron dicha hipoteca y en 1961 otorgaron dos escrituras, una en febrero y otra en septiembre, en que constituyeron hipotecas también sobre el cine para garantizar pagarés suscritos por ambos como deudores solidarios por $7,000 uno y $13,000 otro. Ambos fueron saldados en plazos mensuales pagados a la Administración de Pequeños Negocios.

En ese mismo año 1961, en diciembre, comparecieron en escritura y compraron dos casas en terrenos colindantes con la carretera que conduce de Comerío a Bayamón. Las vendieron mediante escritura otorgada el 18 de febrero de 1969 por $6,500.

En 1962 se produjo la única transacción en que la demandante hizo uso de su derecho a adquirir bienes bajo las capitulaciones matrimoniales. Compró por $14,000 un negocio de transportación pública, pero éste se vendió en septiembre de 1965.

Mientras tanto, en noviembre de 1964, tomaron a préstamo $30,000 mediante pagaré suscrito por ellos como deudores solidarios, que garantizaron con una tercera hipoteca sobre el solar y edificio del cine. Y en agosto de 1967 compraron una finca de 15 cuerdas en el barrio Palomas de Comerío por $16,500, pagando en el acto $8,000 y obligándose a pagar el balance al obtener un préstamo que gestionarían con el Federal Land Bank. La determinación de hecho núm. 15 da una idea del uso a que se destinaron los dineros y terrenos adquiridos. Dice:

15. Entre los años 1964 y 1968, la demandante participó en la operación de un negocio de venta de automóviles, con solares apropiados, tanto en el pueblo de Comerío como en un barrio de esa municipalidad, en los cuales tenían la representación de autos de Gómez Hermanos, Inc. Tenían, además, venta de piezas, y servicio de mecánica de automóviles. La

demandante supervisaba el inventario perpetuo de las unidades y de las piezas, preparaba cheques, examinaba los contratos de venta, y en general, tenía un amplio conocimiento de la operación económica de éste y de los demás negocios, y era la persona que le sometía la información a los contables cuando llegaba el momento de preparar los estados financieros y pagar las contribuciones.

Desde el 1956 y hasta el 1972, en que adquirieron el apartamiento núm. 1606 en el Condominio Torres del Mar en el Condado en Santurce, el matrimonio residió en la casa privativa de ella en el barrio Piñas de Comerío. Se desprende de la determinación de hecho núm. 22 que a dicha casa se le adicionaron facilidades en que operó el taller de mecánica de que se ha hecho mención.

Tanto las propiedades privativas de la demandante como las del demandado fueron utilizadas por ambos como colaterales para la obtención de préstamos para los numerosos negocios que se hicieron. Se adquirieron bienes con el producto del esfuerzo de ambos, que aparecen a nombre del demandado, así como dinero en efectivo en cuentas bancarias y certificados de ahorros. No se llevó contabilidad separada de los bienes de cada uno, ni se les señaló sueldo por sus tareas en la administración de los negocios.

II

El tribunal recurrido, basándose en lo resuelto en *Vilariño Martínez* v. *Registrador*, 88 D.P.R. 288 (1963), partió del supuesto de que la reclamación de la demandante está basada en la alegación de que se variaron durante la vigencia del matrimonio las condiciones pactadas en la escritura sobre capitulaciones. Es correcto que bajo el actual estado de nuestro Derecho civil —que para el caso era el mismo que existía cuando se otorgaron las capitulaciones— éstas no pueden ser alteradas después de celebrado el matrimonio. Art. 1272 del Código Civil, 31 L.P.R.A. sec.

3556.(¹) Así lo reconocimos en *Vilariño Martínez*, supra. Los hechos en dicho caso eran, no obstante, muy distintos a los del presente. En *Vilariño Martínez* se trataba de un matrimonio bajo capitulaciones que, entre otras disposiciones, daban derecho a la esposa de adquirir bienes para sí, pero no le reconocían el mismo derecho al esposo. Éste adquirió una propiedad como privativa suya, ya vigente el matrimonio, y el Registrador se negó a así aceptarlo. Para subsanar el defecto, se otorgó una escritura aclaratoria que confería al marido ese derecho. Era claramente una variación de las capitulaciones hecha después de celebrado el matrimonio, inaceptable bajo el citado Art. 1272. Así lo reconocimos, y confirmamos al Registrador.

■ Cabe notar aquí un paréntesis para señalar que-la prohibición de variar las capitulaciones matrimoniales, o doctrina de su inmutabilidad, de origen oscuro —era desconocida en el Derecho romano— ha caído en desuso y ha sido abolida en los más modernos códigos. Su rigidez fue atenuada en el *Codice civile* italiano luego de la reforma de 1942, y a partir de la *Reale Oronzo* de 1967 y del Proyecto de 18 de octubre de 1972 se permite la modificación de las capitulaciones matrimoniales bajo control judicial. En Francia, cuya legislación se considera originaria del principio de inmutabilidad, sus reformas legislativas, particularmente la Ley de 13 de julio de 1965, han establecido positivamente el principio contrario, es decir, de la mutabilidad de las capitulaciones matrimoniales. Y en España la inmutabilidad fue abolida mediante la reforma del Código Civil, por Ley de 2 de mayo de 1975. Véase, sobre la evolución de la doctrina, M. J. Herrero García, *Contratos Onerosos entre Cónyuges*, Salamanca, 1976, el capítulo titulado "Contratos

---

(¹) Dice así:

"Después de celebrado el matrimonio no se podrán alterar las capitulaciones otorgadas antes, ya se trate de bienes presentes, ya de bienes futuros."

458

entre cónyuges y reglas del estatuto patrimonial", pág. 399 y siguientes, particularmente las págs. 412 a 418. (²)

La razón del principio de inmutabilidad, que el legislador español del 1975 adujo a la probabilidad de que "a través de los pactos postnupciales, pudiera uno de los cónyuges, generalmente la mujer, quedar sometido, en su perjuicio, al influjo psicológico del otro, sin llegar a manifestar su voluntad en condiciones, de plena libertad", (³) ha perdido virtualidad en nuestros tiempos. El pensamiento moderno se orienta hacia reconocer la igualdad entre las personas de sexos opuestos, sin que pueda señalarse que ninguna es per se más fuerte o más débil de voluntad que la otra. Además, de ser la persona de un sexo más débil que la otra, ello sería razón de igual peso para desechar el principio de inmutabilidad, en vez de afianzarlo, pues la falta de voluntad o la voluntad viciada puede ocurrir antes del casamiento y no necesariamente después.

Es interesante notar que la regla o principio de inmutabilidad de las capitulaciones se había debilitado bastante por interpretación del Tribunal Supremo de España mucho antes de la reforma del 1975. Ya en sentencia de 21 de febrero de 1900 admitía la celebración de convenios entre marido y mujer mientras no se afectase el régimen de la sociedad ni implicasen merma en sus respectivos intereses o tendieran a eludir alguna ley prohibitiva. Y en resolución de 16 de marzo de 1959 se estimó que no constituye alteración de capitulaciones "un contrato de sociedad limitada entre los cónyuges". J. Castán Tobeñas, *Derecho civil*

---

(²) El Art. 1.315 del Código Civil español, equivalente al 1267 del nuestro, quedó enmendado por la reforma de 1975, diciendo que "los que se unan en matrimonio podrán otorgar sus capitulaciones antes *o después de celebrarlo* . . .". (Énfasis suplido.) J. Castán Tobeñas, *Derecho civil español, común y foral*, 9na ed., Madrid, Ed. Reus, 1976, T. V, Vol. 1, pág. 293.

(³) Tomado de la Exposición de Motivos de la Ley de 2 de mayo de 1975, antes citada. M.J. Herrero García, *Contratos Onerosos entre Cónyuges*, Salamanca, 1976, pág. 416.

*español, común y foral*, 9na ed., Madrid, Ed. Reus, 1976, T. V, Vol. 1, págs. 320–321.

Volvamos al caso ante nuestra consideración. No es necesario recurrir al moderno principio de mutabilidad, cuya adopción en esta jurisdicción requeriría acción legislativa en vista de la prohibición expresa del Art. 1272, antes citado. En el caso ante nos, no se da variación alguna en las capitulaciones matrimoniales. Cada cónyuge *aportó* determinados bienes al matrimonio, cuyo valor se especificó, "para que al liquidarse la sociedad conyugal le sea reconocido y satisfecho". Así se consignó en la escritura, y se reconoció a cada cónyuge la potestad de administrar sus propios bienes y de realizar toda clase de negocios. Se dijo "y podrá continuar con ellos sus negocios", y más adelante, "pudiendo" realizar toda clase de operaciones, etc. No se dijo que cada cónyuge *tendría* la administración exclusiva de sus bienes y que *realizaría* toda clase de negocios con la exclusión del otro. En otras palabras, los cónyuges no estaban obligados por las capitulaciones pactadas a mantener una separación absoluta de sus bienes y de los frutos de éstos. Podían hacerlo, si querían, pero no lo hicieron.

■ Las capitulaciones matrimoniales constituyen un contrato que, dentro del régimen de libertad que impera en nuestro sistema de contratación, admite toda clase de condiciones que no sean contrarias a la ley, la moral y el orden público. Así, el Art. 1267 del Código Civil, 31 L.P.R.A. sec. 3551, dispone:

> Los que se unan en matrimonio podrán otorgar sus capitulaciones antes de celebrarlo, estipulando las condiciones de la sociedad conyugal relativamente a los bienes presentes y futuros, sin otras limitaciones que las señaladas en este título.
>
> A falta de contrato sobre los bienes, se entenderá el matrimonio contraído bajo el régimen de la sociedad legal de gananciales.

■ Manresa dice que "[s]e trata de un contrato" en que, con la salvedad de disposiciones por causa de muerte,

"[c]abe que se mezclen otros contratos más o menos relacionados con el principal". J.M. Manresa, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1969, T. IX, pág. 123. Al referirse a su irrevocabilidad, señala en la misma página: "Lo estipulado en dichas capitulaciones es irrevocable, porque, si no, no se trataría de un contrato, sino de un acto de última voluntad que exige solemnidades distintas, si bien es irrevocable en el sentido propio y natural de esta palabra, en el sentido de no poder revocarse por la sola voluntad más o menos arbitrariamente, *lo cual no obsta a que pueda quedar sin efecto la estipulación, por cumplimiento o incumplimiento de condiciones*." (Énfasis nuestro.)

Aludiendo a este régimen de libertad en las capitulaciones matrimoniales, dice M. Albaladejo, *Compendio de Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1976, págs. 516-517:

> Como ya he dicho, se llama *capitulaciones matrimoniales* o *capitulaciones*, a secas, al contrato que regula el régimen económico del matrimonio. En él cabe establecer tal regulación, y también otras cosas. Pero aquí sólo importa señalar que, además del mencionado régimen estrictamente hablando, pueden contener acuerdos relativos a la gestión por cada esposo de sus bienes propios, y a la intervención en ellos del otro, y establecer donaciones por razón del matrimonio (cfr. C.c., arts. 1.329 y ss.). La libertad del pacto en las capitulaciones no tiene más límite (art. 1.315, 1.°, *in fine*) que el no poder estipularse (y estipulado, será nulo) nada contrario a las leyes, a las buenas costumbres, ni a los fines del matrimonio (art. 1.316). (Escolio omitido.)[4]

El régimen de sociedad legal de gananciales no es otra cosa que el llamado modo legal que suple el Código Civil para cuando no haya pacto sobre el régimen económico matrimonial. Véase, J.L. Lacruz Berdejo y F. Sancho

---

[4] Los artículos del Código Civil español indicados en esta cita corresponden a los de nuestro Código Civil, así: 1.329 del español al 1281 nuestro; 1.315 y 1.316 del español a los 1267 y 1268 del nuestro.

Rebullida, *Derecho de Familia*, Barcelona, Ed. Bosch, 1966, pág. 107. Más aún, la existencia de capitulaciones matrimoniales no impide ni excluye la existencia de un régimen legal de gananciales. Manresa, *op. cit.*, pág. 128, citando de sentencia del Tribunal Supremo de España de 1 de julio de 1965, dice: "No existe disposición legal alguna, que impide que en las capitulaciones matrimoniales pueda estipularse el régimen legal de gananciales." Véase, al mismo efecto, Lacruz Berdejo, *op. cit.*, pág. 122.

▆▆▆ El régimen de gananciales es, en efecto, una forma de comunidad de bienes —D.C. Valverde, *Tratado de Derecho Civil Español*, 4ta ed., Valladolid, Talleres Tipográficos Cuesta, 1938, T. IV, pág. 281; Castán Tobeñas, *op. cit.*, pág. 294— que suple el Código cuando no hay pacto sobre el régimen económico a seguirse o si, habiendo pacto, sus disposiciones permiten a las partes, como es el caso ante nos, aportar sus bienes a una masa común y administrarlos conjuntamente, sin hacer distinción en cuanto a los ingresos que provengan de esos bienes o de las gestiones de cada cónyuge. Bajo capitulaciones matrimoniales pueden los esposos: (a) mantener el régimen legal regulando las aportaciones de bienes y estableciendo aquellos pactos autorizados y compatibles con dicho sistema; (b) eliminar totalmente el régimen legal, ya simplemente pactando que no regirá la sociedad de gananciales o estableciendo "un nuevo sistema (por ejemplo, el dotal, el de separación de bienes *o el de comunidad absoluta de éstos)*"; y (c) combinar diferentes regímenes, siempre que no se violen los preceptos prohibitivos generales o las prohibiciones especiales impuestas por ley para el régimen que como fundamental se haya pactado. (Énfasis suplido.) Castán Tobeñas, *op. cit.*, págs. 317–318.

▆▆▆ Hemos señalado que las actuaciones de las partes del caso ante nuestra consideración no constituyeron variaciones de las capitulaciones matrimoniales otorgadas por ellos. Nada hicieron ellos que estuviera prohibido o en contravención de lo pactado. Aportaron sus bienes al matri-

monio que contrajeron, le asignaron un valor para el caso de la disolución de la sociedad conyugal y establecieron que cada cónyuge podría disponer de ellos y entrar en negocios sin el consenso del otro. No se obligaron a así hacerlo. De ahí que casi desde los inicios de su unión conyugal y por más de veinte años, administraron sus bienes como si fueran de ambos; se obligaron solidariamente frente a acreedores y garantizaron sus créditos con gravámenes que impusieron a sus propiedades, indistintamente; aportaron su trabajo y su esfuerzo al empeño común de acrecentar el capital; y adquirieron cuantiosos bienes para ambos, sin hacer distinciones en cuanto a la procedencia del dinero invertido en su adquisición. Bajo estos hechos, es evidente que de verdad las partes rigieron su matrimonio como una sociedad legal de gananciales. Ésta no fue descartada y cobró vigencia entre las partes por su propio efecto supletorio.

El tribunal de instancia concluyó en su sentencia que "la labor realizada por la demandante dentro de la unidad empresarial, constituyó un diez por ciento (10%) de la labor total, y en tal medida aportó al aumento del capital del demandado, por lo cual en esta misma proporción debe ser compensada dicha demandante". Aplicó la doctrina de enriquecimiento injusto para en esa proporción de diez por ciento compensar a la demandante por su contribución económica.

■ Es correcto, como señala la sentencia que aquí revisamos, que la doctrina de enriquecimiento injusto, basada en la equidad, es aplicable para hacer justicia a una parte, en ausencia de una obligación contractual o legal de parte de la otra. Esa es la doctrina. Véase, para una exégesis sobre la misma, inclusive su origen, desarrollo histórico y aplicación, *Silva* v. *Comisión Industrial*, 91 D.P.R. 891, 897–904 (1965). Empero, hemos reconocido que la relación económica entre las partes se rigió a base de constituirse una sociedad legal de gananciales a la que aportaron sus

respectivos bienes y en común los administraron, poniendo en ello su esfuerzo y trabajo mutuos, para acrecentar el capital. No hay, por tanto, que recurrir a la equidad y su figura de enriquecimiento injusto. (⁵)

## Conclusión

Por los fundamentos expresados en la presente opinión, *se modificará la sentencia de que aquí se recurre para reconocer que las partes de hecho desarrollaron su actividad económica durante su matrimonio bajo el régimen de sociedad legal de gananciales, que deberá liquidarse a base de reconocer igualdad de derechos en cuanto a los bienes adquiridos, haciendo salvedad de los bienes privativos que cada uno aportó, según consignado en la escritura sobre capitulaciones matrimoniales. Así modificada, será confirmada la sentencia recurrida.*

(⁵) Es de rigor señalar que, aun si tuviéramos que recurrir a la equidad o si presumiéramos la existencia de un contrato implícito de sociedad entre los cónyuges, no podríamos convenir que la aportación de la demandante equivalió a un diez por ciento de la de ambos cónyuges. El caso de ella, según surge de las determinaciones de hecho del tribunal de instancia, no es el del ama de casa que cuida de los hijos y que esporádicamente participa en las gestiones de negocios de la sociedad conyugal. Ella no tenía hijos pequeños que cuidar. Y su dedicación a los negocios que ambos desarrollaron era continua, de día y de noche, en y fuera de Comerío, donde residían. Si algo demuestran dichas determinaciones es que era un dínamo de actividad constante. Al tiempo que atendía la mueblería principal en Comerío, supervisaba las sucursales en Corozal y Barranquitas y participaba en la operación del negocio de venta de automóviles y piezas, y el servicio de mecánica. Por las noches, cuando podía retirarse a disfrutar de un merecido descanso, atendía como taquillera el negocio de cine, esto a pesar de que había un administrador.

En ausencia de prueba de que el demandado preparaba esa actividad, sería forzoso concluir que la aportación de ella fue, cuando menos, igual a la de él.