UNISYS PUERTO RICO, INC., demandante y reconvenida, *v.* RAMALLO BROTHERS PRINTING, INC., demandada, tercera demandante y reconveniente; MANAGEMENT INFORMATION CORPORATION, tercera demandada y recurrente.

*Número:* CE-89-754 *Resuelto:* 28 de junio de 1991

844

*Enrique J. Mendoza Méndez*, abogado de Management Information Corporation, tercera demandada y recurrente; *Luis F. Ferrer Díaz*, abogado de Ramallo Brothers Printing, Inc., reconvenida.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

La controversia en este caso gira alrededor de si bajo los hechos, según constan en esta etapa de los procedimientos, deberíamos ordenar el cumplimiento específico de la cláusula de selección de foro pactada entre Management Information Corporation (en adelante M.I.C.) y Ramallo Brothers Printing, Inc. (en adelante Ramallo).

I

*Hechos*

El presente caso se originó con una demanda civil en cobro de dinero presentada por Unisys Puerto Rico, Inc. (en adelante Unisys) contra Ramallo por la venta de un equipo de computadoras.

Ramallo contestó la demanda y, a su vez, reconvino y presentó demanda contra tercero contra M.I.C.(1) En la reconvención solicitó la resolución de su contrato de compra de equipo con Unisys, y en la demanda contra tercero la resolución de su contrato de suministro de un sistema de programación (*software*) con M.I.C. En la reconvención y demanda contra tercero, bajo juramento alegó, entre otros, los hechos siguientes:

2. Allá para mediados de 1986, Ramallo decidió adquirir un sistema de computadora ("hardware") con la programación ("software") adecuada para satisfacer las diversas y crecientes necesidades de la empresa en términos del mejor control de la producción en la planta y la automatización e integración del flujo de información relativa a dicha producción; como son, [sic] las cotizaciones, el control de costos, la capacidad máxima de la planta, los márgenes de ganancia, órdenes de compra, facturación y contabilidad en general.

3. A esos fines, Ramallo solicitó cotizaciones de varias compañías dedicadas a la venta de computadoras enfatizándoles [su] intención de adquirir *un sistema integrado de equipo y programación* capaz

---

(1) Estas alegaciones se presentaron juradas.

de satisfacer las necesidades de una empresa de imprenta como la de Ramallo.

4. De hecho, la práctica de mercadeo en la industria de computadoras es que un fabricante de equipo de computadora y un [sic] o más fabricantes de programación *conjuntamente* mercadean un *sistema completo* a clientes prospectivos. La práctica es conocida como "joint marketing" y a las compañías de programación afiliadas a determinado fabricante de equipo se les conoce como el "BARR" de esa compañía. Esta práctica se debe al hecho que, para que un sistema funcione adecuadamente, tiene que haber un alto grado de compatibilidad entre el equipo y la programación.

5. Consistente con lo anterior, Ramallo recibió propuestas y cotizaciones de varias entidades para un sistema de computadora con una programación diseñada para las necesidades de un negocio de imprenta como el de Ramallo. Las propuestas, presentadas por un representante del fabricante del equipo de computadora, incluían la programación de otra entidad y *cotizaban por el costo total del sistema integrado.* Por ejemplo:

a) Data Ceneral Puerto Rico, Inc., cotizó su equipo con la programación de Automated Quill, Inc. por un precio total de $150,000, más servicios de mantenimiento;

b) McDonnell Douglas Computer Systems Company, a través de su representante en Puerto Rico, Minicomp Systems, Inc., cotizó su equipo con la programación de "Printing Industry Management and Control System" ("PRIMAC") de Computer Business Associates, por un precio total de $137,260.00; más servicio de mantenimiento;

c) Burroughs, Inc., a través de su director de mercadeo, Sr. Luis F. Sánchez, cotizó su equipo con la programación "Printer Management System" (PMS) de Computer Management Systems de California, por un precio total de $132,000, más servicio de mantenimiento.

6. Alrededor del 15 de abril de 1987, Burroughs Inc. fue adquirida por Unisys Corporation, corporación matriz de la demandante-reconvenida Unisys Puerto Rico, Inc., y ésta última asumió las actividades locales de Burroughs, Inc. en Puerto Rico. Como Exhibit "A" de este escrito se aneja Certificación del Departamento de Estado sobre enmienda al Certificado de Incorporación de Burroghs, [sic] Inc. para cambiar su nombre a "Unisys Puerto Rico, Inc." El Sr. Sánchez de Burroughs pasó a ser Gerente General de la demandante-reconvenida Unisys.

7. Poco después de abril de 1987, el referido Sr. Sánchez le indicó a Ramallo que no podía ofrecer la programación PMS objeto de su

previa cotización debido a que dicha programación era un "Barr" exclusivo para equipo de la firma MAI del Caribe, Inc. No obstante, Sánchez indicó que Unisys podía ofrecer una programación sustituta, conocida como "Printers Business Computer System for the Graphic Arts Industry" de la firma, aquí tercera demandada, Management Information Corporation (MIC), que es una compañía de programación afiliada a Unisys; o sea, es el "Barr" de Unisys.

8. El 8 de septiembre de 1987, representantes de Unisys y MIC *conjuntamente* le sometieron a Ramallo una propuesta escrita ("Joint Proposal"), basada en un estudio que efectuaron de las necesidades de Ramallo, en la que le recomendaron a Ramallo la compra de un sistema de computadora integrado consistente de un equipo de computadora marca "Unisys" Modelo 5000/50 con la programación de MIC "Printers Business Computer" ("PBC") por el precio total de $122,311 ($75,371 el equipo y $46,940 la programación), más servicios de mantenimiento. En la propuesta expresamente se le garantizó a Ramallo que dicho sistema "le permitiría a Ramallo Brothers Printing realizar el potencial total de información *relevante, precisa* y a *tiempo*". (Énfasis nuestro).

9. A esos efectos, en la referida propuesta conjunta Unisys y MIC le especificaron a Ramallo los cuatro módulos que componían el sistema a implementarse, [sic] *aunque anticiparon que ciertas modificaciones serían necesarias para satisfacer los requerimientos específicos del negocio de Ramallo.*

. . . . . . . .

10. Descansado en las representaciones hechas en la propuesta conjunta del 8 de septiembre de 1987 y en el precio competitivo ofrecido por el sistema Unisys/MIC, Ramallo decidió adquirirlo. A esos efectos, en octubre y noviembre de 1987, Ramallo continuó comunicaciones con los representantes de Unisys y MIC en cuanto a ajustes de precio, fechas de instalación e implementación [sic] de la programación. Se le indicó a Ramallo que la instalación e implementación [sic] del sistema tomaría diez (10) meses en completar [sic].

11. De conformidad con lo anterior, el 16 de noviembre de 1987, Ramallo otorgó contratos de compraventa y mantenimiento con Unisys y MIC. Ese mismo día Ramallo expidió un cheque por la cantidad de $10,000 a favor de MIC como pronto pago para la programación "PBC" a implementarse [sic] con la computadora Unisys 5000/50c. Como parte de los acuerdos se dispuso que Ramallo no podría cambiar el equipo de Unisys sin la previa notificación y autorización de MIC. Tanto la cantidad total corres-

pondiente a Unisys por el equipo ($74,801.00) como el balance correspondiente a MIC por la programación ($30,000) quedaron pendiente [sic] hasta completada la instalación y el funcionamiento operacional del sistema. (Énfasis en el original.) Apéndice, págs. 3–6.

Unisys presentó contestación a la reconvención, mientras que M.I.C. solicitó la desestimación por falta de jurisdicción. Alegó que el contrato que suscribió con Ramallo contiene una cláusula de selección de foro mediante la cual las partes pactaron que litigarían sus disputas con relación al contrato en los tribunales del estado de Michigan. Ramallo, por su parte, se opuso a la moción de desestimación aduciendo que no podía aplicarse en esta controversia la cláusula de selección de foro, por cuanto M.I.C. era una parte indispensable en el pleito. Argumentó, además, que dejar fuera a una parte indispensable derrotaría la política pública del Estado a los efectos de que comparezcan en el pleito todas aquellas partes indispensables, de manera que pueda adjudicarse la controversia. M.I.C. presentó réplica a la oposición, la cual acompañó con una copia del contrato entre ésta y Ramallo.(2)

El foro de instancia denegó la moción de desestimación. De dicha resolución acudió M.I.C. ante nos mediante recurso de *certiorari*. Alegó, en síntesis, que el tribunal de instancia erró al no darle validez a la cláusula contractual de selección de foro. Decidimos revisar y expedimos el auto.

## II

*Principios generales sobre contratos*

■ En Puerto Rico rige el principio de la libertad de contratación y, como parte de este principio, las partes contratantes "pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la

---

(2) En los autos originales también consta una carta enviada por Ramallo Brothers Printing, Inc. (en adelante Ramallo) a Management Information Corporation (en adelante M.I.C.) el 19 de diciembre de 1988, relacionada con aparentes problemas que éstos estaban confrontando con el programa obtenido de M.I.C. Esta carta la presentó Ramallo como anejo a una moción en la que se solicitaba emplazamiento mediante edictos de M.I.C.

moral, ni al orden público". Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372. Véanse: *Dennis, Metro Invs. v. City Fed. Savs.*, 121 D.P.R. 197 (1988); *Morales v. Municipio de Toa Baja*, 119 D.P.R. 682, 684–685 (1987); *Reyes v. Jusino*, 116 D.P.R. 275, 287 (1985); *Flores v. Municipio de Caguas*, 114 D.P.R. 521, 529 (1983); *Umpierre v. Torres Díaz*, 114 D.P.R. 449, 459 (1983); *Tastee Freez v. Negdo. Seg. Empleo*, 108 D.P.R. 495, 501 (1979); *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149, 153 (1976); *Castell Enterprises, Inc. v. Registrador*, 87 D.P.R. 775, 781 (1963); *Rasa Eng. Corp. v. Daubón*, 86 D.P.R. 193, 196 (1962). La violación de uno de estos principios podría producir la nulidad absoluta de lo pactado.

■ El orden público impone ciertas restricciones a la voluntad del hombre, las cuales, en gran medida, sirven para garantizar esa misma voluntad. J. Vélez Torres, *Curso de Derecho Civil: derecho de contratos*, San Juan, Ed. Rev. Jur. U.I.A. de P.R., 1990, T. IV, Vol. II, pág. 6.

■ Ciertamente, el orden público es parte de la política pública que permite y contribuye a una mejor convivencia social. En *Hernández v. Méndez & Assoc. Dev. Corp.*, supra, pág. 153, definimos este concepto de la manera siguiente:

. . . [E]s el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. El concepto orden público recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. En gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero que aun sin esa expresa declaración legislativa, constituyen principios rectores de sabio gobierno nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin por el estilo de una sociedad. (Cita omitida.) Véanse: *WACO Export Co. v. Expreso Meteoro*, 108 D.P.R. 309, 314–316 (1979); *Asoc. de Condóminos v. Seguros Arana*, 106 D.P.R. 133, 138–139 (1977); *Asoc. de Condóminos v. Centro I, Inc.*, 106 D.P.R. 185, 193–195 (1977); *Franceschi v. Texaco P.R., Inc.*, 103 D.P.R. 759, 762–764 (1975).

 Los contratos se perfeccionan por el mero consentimiento, y desde ese momento cada una de las partes viene obligada no sólo a cumplir con lo expresamente pactado, sino también con las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A. sec. 3375; *Kogan v. Registrador*, 125 D.P.R. 636 (1990); *Ramírez v. Club Cala de Palmas*, 123 D.P.R. 339 (1989); *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517, 526–527 (1982); *E.L.A. v. Great American Ins. Co.*, 106 D.P.R. 825, 829–830 (1978); *Ameco v. Jaress Corp.*, 98 D.P.R. 838, 845 (1970). Su validez y cumplimiento no puede dejarse al arbitrio de una de las partes. Art. 1208 del Código Civil, 31 L.P.R.A. sec. 3373.

 Cuando los términos de un contrato, sus condiciones y exclusiones, son claros y específicos y no dan margen a ambigüedades o diferentes interpretaciones, así deben aplicarse. Art. 1233 del Código Civil, 31 L.P.R.A. sec. 3471; *García Curbelo v. A.F.F.*, 127 D.P.R. 747 (1991); *Casanova v. P.R. Amer. Ins. Co.*, 106 D.P.R. 689, 696–697 (1978). Recordemos que el cumplimiento de lo pactado está estrechamente vinculado con la buena fe de los contratantes. Es por ello que, con respecto al principio de la obligatoriedad de los contratos, Díez-Picazo ha comentado:

> . . . [Se] considera como un principio que debe regir en toda sociedad civilizada la idea de que los hombres deben poder contar con que aquellos con quienes tratan en el intercambio social actuarán de buena fe y por tanto llevarán a cabo las expectativas razonables que sus promesas o su conducta hayan creado razonablemente en los demás. La obligatoriedad del contrato se funda, pues, de acuerdo con esta idea en una norma ética derivada de la buena fe, que exige no defraudar la confianza que en otro pueda haber creado nuestra promesa o nuestra conducta. En definitiva, se trata de lo que el autor citado denomina la norma ética de veracidad en nuestras comunicaciones con el prójimo, y que ordinariamente se expresa como deber de atenerse a la palabra dada. L. Díez-Picazo, *Fundamentos de Derecho Civil Patrimonial*, 2da ed., Madrid, Ed. Tecnos, 1983, Vol. I, Cap. IV, pág. 99.

 En nuestra jurisdicción priva la teoría de la subjetividad de la interpretación de los contratos. "La interpretación de un

contrato conlleva el reconstruir el sentido de una declaración negocial para conseguir los efectos deseados por las partes." *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161 (1989). Para determinar cuál fue "la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato"; también se tomarán en consideración los actos anteriores a la contratación. Art. 1234 del Código Civil, 31 L.P.R.A. sec. 3472. "Después de todo, los actos preparativos del contrato son muchas veces más imparciales que los posteriores. . . . [P]ara determinar esa voluntad [hay que tomar] en consideración *la ocasión, las circunstancias, las personas y el acuerdo que se intentó llevar a cabo.*" (Énfasis suplido.) *Ramírez, Segal & Látimer v. Rojo Rigual*, supra, pág. 174. Véanse: D. Espín Cánovas, *Manual de Derecho Civil Español*, 4ta ed., Madrid, Ed. Rev. Der. Privado, 1975, Vol. III, Cap. I, págs. 424–425; L. Díez-Picazo y Gullón, *Sistema de Derecho Civil*, 4ta ed., Madrid, Ed. Tecnos, 1984, Vol. II, Cap. 10. En la determinación sobre cuál ha sido la intención de las partes al contratar, resulta de suma importancia tomar en consideración quiénes son las partes, en particular sus experiencias y conocimientos especializados sobre la materia sobre la cual versa el contrato.

La validez del consentimiento y del contrato en que el mismo fue prestado se presume. No obstante, dicho consentimiento será nulo si fue prestado por error, violencia, intimidación o dolo. Art. 1217 del Código Civil, 31 L.P.R.A. sec. 3404. Véanse: *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405, 416 (1978); *Rosa Valentín v. Vázquez Lozada*, 103 D.P.R. 796, 812 (1975), y *Capó Caballero v. Ramos*, 83 D.P.R. 650, 671–673 (1961), por error; *Nassar Rizek v. Hernández*, 123 D.P.R. 360 (1989), y *S.J. Credit, Inc. v. Ramírez*, 113 D.P.R. 181, 195 (1982), por intimidación; *Citibank v. Dependable Ins. Co., Inc.*, 121 D.P.R. 503 (1988); *Torres v. Gracia*, 119 D.P.R. 698, 710 (1987); *Márquez v. Torres Campos*, 111 D.P.R. 854, 863–865 (1982); *Acosta & Rodas, Inc. v. PRAICO*, 112 D.P.R. 583, 616–617 (1982), y *García López v. Méndez García*, 102 D.P.R. 383, 393 (1974), por dolo. Según

Díez-Picazo, un vicio del consentimiento existe siempre que la voluntad contractual se haya formado defectuosamente. Díez-Picazo y Gullón, *op. cit.*, pág. 117.

Cuando en un contrato bilateral uno de los contratantes no cumple con lo que se obligó, el otro tiene el derecho de escoger entre exigir el cumplimiento o la resolución de la obligación con el resarcimiento de daños y abono de intereses en ambos casos. *Ramírez v. Club Cala de Palmas*, supra, pág. 347. Este derecho de opción está enunciado en el Art. 1077 del Código Civil, 31 L.P.R.A. sec. 3052, el cual dispone:

> La facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe.
>
> El perjudicado podrá escoger entre exigir el cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de intereses en ambos casos. También podrá pedir la resolución, aun después de haber optado por el cumplimiento, cuando éste resultare imposible.
>
> El tribunal decretará la resolución que se reclame, a no haber causas justificadas que le autoricen para señalar plazo.
>
> Esto se entiende sin perjuicio de los derechos de terceros adquirentes, con arreglo a la secs. 3496 y 3499 de este título, y las disposiciones de la Ley Hipotecaria y del Registro de la Propiedad, secs. 2001 *et seq.* del Título 30.

Como podrá observarse, el citado Art. 1077 considera no sólo el caso de incumplimiento total, sino también el de incumplimiento parcial. Ahora bien, la acción de resolución pertenece solamente al contratante que, tras haber cumplido con su obligación o estando dispuesto a ejecutarla, no puede obtener el cumplimiento de la de su contraparte. G. Velázquez, *Obligaciones y contratos según la legislación y la jurisprudencia puertorriqueñas*, Río Piedras, [s.ed.], 1939, pág. 99.

Una vez hecha la exposición sobre las normas generales aplicables en materia de contratos y su interpretación, pasamos a discutir lo relacionado a la cláusula de selección de foro.

# III

*Las cláusulas de selección de foro en Estados Unidos*

■ Aunque anteriormente nos hemos expresado sobre varios aspectos de las cláusulas de selección de foro o la ley aplicable, el caso de autos nos ofrece la oportunidad de pronunciarnos específicamente sobre la validez y aplicación de estas cláusulas. Sin profundizar en *Walborg Corp. v. Tribunal Superior*, 104 D.P.R. 184, 192 (1975),(3) señalamos:

> *Queda por resolver el problema del efecto del acuerdo de las partes sobre la ley aplicable*, asumiendo, para fines de argumentación, su separabilidad del problema planteado por la cláusula de arbitraje. *Las cláusulas en que se escoge la ley se consideran válidas usualmente cuando la jurisdicción seleccionada tiene contactos sustanciales con el contrato. Dichas cláusulas son ineficaces, sin embargo, cuando chocan contra consideraciones fundamentales de orden público del foro.* (Citas omitidas y énfasis suplido.)

Estamos en posición de acometer la tarea inconclusa en *Walborg Corp. v. Tribunal Superior*, supra, pero para ello, por no existir jurisprudencia aplicable en nuestra jurisdicción, acudiremos, para orientación y por su valor persuasivo, a la jurisprudencia federal norteamericana donde este asunto ha sido tratado extensamente.

■ En la jurisdicción federal, como regla general, se le ha dado validez a las cláusulas contractuales de selección de foro. *En Midwest Mech. Contr. v. Tampa Constructors, Inc.*, 659 F. Supp. 526, 530 (W.D. Mo. 1987), se dijo:

> "[I]t is settled . . . that parties to a contract may agree in advance to submit to the jurisdiction of a given court. . . ."

---

(3) Este caso fue revocado por *World Films, Inc. v. Paramount Pict. Corp.*, 125 D.P.R. 352 (1990), en cuanto dispuso que en tanto el Art. 3b de la Ley de Contratos de Distribución, Ley Núm. 75 de 24 de junio de 1964, según enmendada, 10 L.P.R.A. sec. 278b-2, conflija en su aplicación con la Ley Federal de Arbitraje, prevalecerá esta última. Dicho dictamen en nada afectó lo expresado con relación a las cláusulas contractuales sobre selección de foro.

*National Equipment Rental, Ltd v. Szukhent*, 375 U.S. 311, 315–16, 84 S. Ct. 411, 414, 11 L. Ed. 2d 354 (1964). A party can freely consent to the personal jurisdiction of a court because personal jurisdiction is an individual right capable of being waived. *Insurance Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 703, 102 S. Ct. 2099, 2105, 72 L. Ed. 2d 492 (1982). However, the forum selection clause containing the defendant's consent must comply with applicable due process standards. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S. Ct. 2174, 2182 n. 14, 85 L. Ed. 2d 528 (1985). *Thus, the clause must have been obtained through freely negotiated agreements absent fraud and overreaching and its enforcement must not be unreasonable and unjust.* (Énfasis suplido.) *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15, 92 S. Ct. 1907, 1916, 32 L. Ed. 2d 513 (1972) . . . ."

Hay que tener presente que estas cláusulas contractuales de selección de foro están íntimamente relacionadas con la política pública de no imponer trabas al comercio interestatal e internacional. Es por ello que en *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1971), el Tribunal Supremo de Estados Unidos expresó:

Thus, in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside.

El Tribunal estableció una fuerte presunción a favor de la validez de las cláusulas contractuales de selección de foro. La razón de decidir en este caso ha sido aplicada y extendida en casos posteriores. A tales efectos, en *Houston Intern. Televideo v. Technicolor, Inc.*, 647 F. Supp. 554, 555 (S.D. Tex. 1986), se sostuvo que:

Although *Bremen* arose in the admiralty context, its rational is applicable elsewhere, and indeed has been applied in other contexts. *In re Fireman's Fund Insurance Companies*, 588 F.2d 93 (5th Cir. 1979); *Hoffman v. Burroughs Corporations*, 571 F. Supp. 545 (N.D. Tex. 1982).

Además, se ha señalado que el hacer valer una cláusula de selección de foro protege los intereses legítimos de las partes, sus

expectativas y, sobre todo, fomenta los intereses vitales del sistema de justicia. *Stewart Organization v. Ricoh Corp.*, 487 U.S. 22, 33–34 (1988), opinión concurrente del Juez Asociado Señor Kennedy.

■ Como hemos visto, la doctrina vigente en la esfera federal favorece las cláusulas contractuales de selección de foro. Se ha determinado que éstas son válidas y razonables a menos que se demuestre lo contrario. Para derrotar su aplicación, la parte que se opone a la misma tiene el peso de la prueba.

> Under federal common law, forum-selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." "The party resisting enforcement of the clause bears a heavy burden of proof to shown unreasonableness. (Citas omitidas.) *Kline v. Kawai America Corp.*, 488 F. Supp. 868, 871 (1980).

■ Jurisprudencialmente se han ido desarrollando una serie de criterios para guiar el análisis de los tribunales sobre las circunstancias que deben mediar para determinar la no aplicabilidad de la cláusula contractual de selección de foro.(4) Entre éstos se encuentran:

1. Que el foro seleccionado resulta ser irrazonable e injusto.

2. Que de ventilarse el caso en dicho foro se incurriría en una clara y patente inequidad, o sería irrazonable o injusto.

3. Que la cláusula no es válida porque fue negociada mediando fraude o engaño.

4. Que la implantación de dicha cláusula derrotaría la política pública del Estado.

Pasemos ahora a considerar los aspectos procesales ante nuestra consideración.

---

(4) Véanse: *Carnival Cruise Lines, Inc. v. Eulala Shute, et vir*, 59 L.W. 4323 (1991); *Stewart Organization v. Ricoh Corp.*, 101 L.Ed.2d 22 (1988); *Midwest Mech. Contr. v. Tampa Constructors, Inc.*, 659 F. Supp. 526 (W.D. Mo. 1987); *Houston Intern. Televideo v. Technicolor, Inc.*, 647 F. Supp. 554 (S.D. Tex. 1986); *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1971); *National Equipment Rental v. Szukhent*, 375 U.S. 311 (1964), y casos allí citados.

IV

*La moción de desestimación y una parte indispensable*

 Reiteradamente hemos expresado que, a los fines de disponer de una moción de desestimación, tienen que resumirse como ciertos los hechos bien alegados en la demanda. *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1 (1989); *Romero Arroyo v. E.L.A.*, 127 D.P.R. 724 (1991); *Pueblo v. Rodríguez Aponte*, 116 D.P.R. 653 (1985); *First Fed. Savs. v. Asoc. de Condómines*, 114 D.P.R. 426 (1983). En otras palabras, cuando se pide la desestimación de una demanda "por vicio intrínseco de la misma el que formula la moción hace el siguiente planteamiento: 'Yo acepto para los propósitos de mi moción de desestimación que todo lo que se dice en esta demanda es cierto, pero aun así, no aduce una reclamación que justifique la concesión de un remedio, o no se ha unido una parte indispensable, o el tribunal no tiene jurisdicción, etc.' Es decir, a los efectos de considerar esta moción no se ponen en duda los hechos aseverados porque se ataca por un vicio intrínseco de la demanda o del proceso seguido". R. Hernández Colón, *Manual de Derecho Procesal Civil*, Hato Rey, Ed. Equity de Puerto Rico, 1969, pág. 179. Al decir esto, cabe señalar que esta doctrina se aplica solamente a los hechos bien alegados y expresados de manera clara y concluyente, que no den margen a dudas. *First Fed. Savs. v. Asoc. de Condómines*, supra, págs. 431–432.

 Las alegaciones de la demanda se examinarán liberalmente y de la manera más favorable al demandante. Únicamente se desestimará la acción si el promovente no tiene derecho a remedio alguno bajo cualesquiera hechos que pueda probar en juicio. *Granados v. Rodríguez Estrada I*, supra; *González Camacho v. Santos Cruz*, 124 D.P.R. 396 (1989); *Candal v. CT Radiology Office, Inc.*, 112 D.P.R. 227 (1982); *Moa v. E.L.A.*, 100 D.P.R. 573, 587 (1972); *Reyes v. Sucn. Sánchez Soto*, 98 D.P.R. 305 (1970); J.A. Cuevas Segarra, *Práctica Procesal Puertorriqueña: Procedimiento Civil*, San Juan, Pubs. J.T.S., 1985, Vol. II, Cap. III, págs. 63–64; Regla 70 de Procedimiento Civil, 32 L.P.R.A. Ap. III.

De otra parte, la Regla 16.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que "[l]as personas que tuvieren interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada". Con relación a esta regla hemos acogido un enfoque práctico, velando por que al interpretarla se lleve a cabo su propósito de "proteger a las personas ausentes de los efectos perjudiciales que pudiera tener la resolución del caso sin la presencia de ellos y evitar la multiplicidad de pleitos mediante un remedio efectivo y completo". *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 412–413 (1982); *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 603–608 (1983); *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989).

La persona que reúna los requisitos de parte indispensable tiene que ser traída al pleito con tiempo suficiente para que se pueda defender si así lo desea; de lo contrario, la sentencia que se dicte no será válida. *Granados v. Rodríguez Estrada II*, supra.

## V

*Aplicación de las normas de derecho a los hechos*

Si tomamos como ciertos los hechos alegados en la demanda contra tercero, encontramos que de éstos surge que Ramallo intentó "adquirir un sistema integrado de programación capaz de satisfacer las necesidades de una empresa de imprenta . . . [y que] la práctica de mercadeo en la industria de computadora es que un fabricante de equipo de computadora y un [sic] o más fabricantes de programación conjuntamente mercadean un sistema completo a clientes prospectivos". Apéndice, pág. 3. Ramallo solicitó cotizaciones de varias compañías dedicadas a la venta de computadoras enfatizándoles que su intención era el adquirir un sistema integrado. "Consistente con lo anterior . . . recibió propuestas y cotizaciones de varias entidades para un sistema de

computadora con una programación diseñada para las necesidades de un negocio de imprenta como el de Ramallo. Las propuestas, presentadas por un representante del fabricante del equipo de computadora, incluían la programación de otra entidad y cotizaban por el costo total del sistema integrado." Íd., pág. 4.

También de la demanda contra tercero surge que el 8 de septiembre de 1987 representantes de Unisys y M.I.C. conjuntamente le sometieron una propuesta escrita (*joint proposal*). Es en conformidad con lo anterior que el 16 de noviembre de 1987 Ramallo otorgó contratos de compraventa y mantenimiento con Unisys y M.I.C. En enero de 1988 comenzó la instalación e implantación del sistema. Desafortunadamente, surgieron una serie de problemas que impidieron el exitoso funcionamiento del mismo. Durante todo el año 1988, tanto Unisys como M.I.C. se comprometieron a lograr una exitosa instalación e implantación del sistema. A pesar de esto, el 3 de enero de 1989 "Unisys le comunicó a Ramallo que los problemas persistentes en la implementación [sic] de la programación del sistema vendido no era su responsabilidad y por primera vez le exigió . . . el pago del precio correspondiente para aquella *parte* del equipo que llegó a entregar". (Énfasis en el original.) Apéndice I, pág. 8.

 De los hechos reseñados se podría concluir que estamos frente a una transacción de negocio que, aunque unitaria, está compuesta de dos (2) partes, el equipo y la programación, a ser suplidos por dos (2) entidades distintas y reflejada por dos (2) contratos. También surge de las alegaciones que este tipo de negociación es la práctica en la industria de computadora; "un fabricante de equipo de computadora y un [sic] o más fabricantes de programación *conjuntamente* mercadean un *sistema completo* . . .". (Énfasis en el original.) Apéndice I, pág. 3. Esta práctica se conoce como mercadeo conjunto (*joint marketing*). "[A] las compañías de programación afiliadas a determinado fabricante de equipo se les conoce como el 'BARR' de esa compañía." Íd.

 Ante estas circunstancias, para el tribunal de instancia poder adjudicar la reclamación de Unisys en la demanda y la

reconvención compulsoria presentada por Ramallo, tiene primero que resolver la controversia de si lo que se negoció entre Ramallo y Unisys y entre Ramallo y M.I.C. fue la adquisición de un sistema completo a pesar de haberse reflejado dicha transacción en dos (2) contratos por separado, uno suscrito por Unisys y otro suscrito por M.I.C.; o si, por el contrario, se trata de negociaciones y contratos individuales independientes. La necesidad de resolver esta controversia convierte a M.I.C. en parte indispensable, tanto con relación a la demanda original presentada por Unisys como con la reconvención compulsoria y demanda contra tercero presentada por Ramallo. M.I.C. tiene un interés común con Unisys en la determinación de la controversia sobre el tipo de negociación y contratación que se llevó a cabo. Sin su presencia no se podría adjudicar esta controversia, pues no se podría confeccionar un decreto sin que sus intereses quedaran afectados.

Pasemos ahora a considerar si bajo estas circunstancias procedía, en esta etapa de los procedimientos, ordenar el cumplimiento específico de la cláusula de selección de foro contenida en el contrato suscrito entre Ramallo y M.I.C.

Para determinar cuál fue la intención de las partes, o sea, de Ramallo, Unisys y M.I.C., el foro de instancia, entre otras cosas, tendrá que tomar en consideración no sólo los contratos suscritos por éstas, sino también la práctica de mercadeo en la industria, los actos de los contratantes anteriores, coetáneos y posteriores al contrato, y quiénes son las partes, haciendo particular hincapié en el conocimiento especializado que todos o algunos de ellos pudieran tener sobre la materia objeto del contrato.

El contrato otorgado entre M.I.C. y Ramallo contiene la siguiente cláusula de selección de foro, C.7:

7. GOVERNING LAW, VENUE, AND PREVAILING PARTY.
This Agreement shall be interpreted in accordance with the laws, but not the rules relating to the choice of law of State of Michigan. In the event that the laws of the State of Michigan are held to be inapplicable, then the laws, but not the rules relating to the choice of law of the State of Michigan will apply.

Any action at law, suit in equity, or judicial proceeding for the enforcement of this Agreement or any provision thereof *shall be*

*instituted only in the courts of the State of Michigan or the Federal District courts sitting in the State of Michigan.* (Énfasis suplido.) Apéndice 5, pág. 35.

Veamos el contexto procesal dentro del cual surge la solicitud de cumplimiento específico de la cláusula de selección de foro. Una vez Ramallo presentó demanda contra tercero, M.I.C. compareció ante el tribunal y, mediante moción, solicitó la desestimación de la reclamación en su contra por alegada falta de jurisdicción. Fundamentó su posición en la cláusula de selección de foro suscrita por ella y Ramallo. Adujo que dicha cláusula impedía la litigación en los tribunales de Puerto Rico, pues las partes se comprometieron a dirimir sus disputas con relación al contrato en los tribunales del estado de Michigan, Estados Unidos. Como podrá observarse, en realidad lo que M.I.C. solicitó fue el cumplimiento específico de esta cláusula contractual.[5]

El caso de autos comenzó cuando Unisys presentó en el Tribunal Superior, Sala de San Juan, una acción en cobro de dinero y cumplimiento de contrato contra Ramallo. Éste, a su vez, reconvino mediante reconvención compulsoria y presentó demanda contra tercero contra M.I.C. En ambas reclamó la resolución de las obligaciones contraídas con Unisys y M.I.C., la responsabilidad solidaria de M.I.C. y Unisys por la cantidad de ciento setenta y tres mil ochocientos setenta y cuatro dólares ($173,874) por concepto de los pagos hechos y daños,[6] y en la

---

[5] La moción presentada por M.I.C. fue intitulada "Moción de Desestimación por Falta de Jurisdicción".

Falta de jurisdicción sobre la materia significa que el tribunal carece de autoridad y poder para entender en el asunto. *Rodríguez v. Registrador*, 75 D.P.R. 712, 716 (1953); *López Rivera v. Autoridad Fuentes Fluviales*, 89 D.P.R. 414, 419 (1963).

No se trata, pues, de falta de jurisdicción sobre la materia. Las partes mediante contrato no pueden otorgar ni privar de jurisdicción sobre la materia a un tribunal. Sólo el Estado, a través de sus leyes, puede hacerlo así.

De otra parte, la falta de jurisdicción sobre la persona es un derecho individual y, por lo tanto, renunciable. En otras palabras, tanto Ramallo como M.I.C. habían contractualmente renunciado a cualquier alegación que pudieran hacer de falta de jurisdicción sobre su persona en los tribunales del estado de Michigan con relación a cualquier caso sobre la implantación del contrato suscrito entre ambos. Esta no es la situación que confrontamos.

[6] En la demanda contra tercero se aducen varias teorías en apoyo de la solicitud de resolución de los contratos.

alternativa, la anulación de los contratos con Unisys y M.I.C. con la restitución recíproca de "las cosas que hubiesen sido materia de los contratos" (Apéndice, pág. 11), veintitrés mil seiscientos dólares ($23,600) por concepto de intereses y ciento cincuenta mil doscientos noventa y cuatro dólares ($150,294) en daños.(7) Si Ramallo logra probar estas alegaciones, habrá demostrado que, bajo las circunstancias específicas de este caso, la cláusula de selección de foro no debería implantarse, ya que resultaría ser irrazonable e injusta.

■ Resolvemos, pues, que en esta etapa de los procedimientos M.I.C. es una parte indispensable. Sin su presencia habría que desestimar no sólo la demanda contra tercero, sino también la demanda original y la reconvención compulsoria. La implantación de la cláusula de selección de foro, bajo estas circunstancias, resultaría en una clara y patente inequidad para todas las partes en el caso.(8)

Procede confirmar la resolución del foro de instancia que deniega la desestimación de la demanda contra tercero.

Por todo lo antes expuesto, *se dictará sentencia que confirme la resolución del Tribunal Superior, Sala de San Juan, de 9 de octubre de 1989 y se devuelve el caso para que continúen los procedimientos de forma compatible con lo aquí resuelto.*

El Juez Presidente Señor Pons Núñez no intervino. El Juez Asociado Señor Alonso Alonso se inhibió.

---

(7) En la reconvención compulsoria reclamó, además, el pago de nueve mil trescientos veinte dólares ($9,320) por concepto de servicios de impresos.

(8) El foro de instancia tiene amplia discreción en el manejo de los procedimientos para lograr que éstos sean resueltos de forma justa, rápida y económica. Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III.