# 2008 DTA 101

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE CAGUAS**
**(PANEL XII)**

ISRAEL PÉREZ RIVERA
Recurrido

v.

RAMÍREZ & CO., S.E., RG PREMIER BANK
Recurrentes

Núm. KLRA-08-00433

San Juan, Puerto Rico, a 13 de agosto de 2008

Panel integrado por su Presidenta, la Juez Pesante Martínez,
y los Jueces Escribano Medina y Hernández Torres

Hernández Torres, Jueza Ponente

**TEXTO COMPLETO DE LA SENTENCIA**

Ramírez & Co. S.E., el recurrente o Ramírez, solicita la revisión de una Resolución emitida por el Departamento de Asuntos del Consumidor (el D.A.Co.) Oficina de Caguas (Edgardo López Carrasquillo, Juez Administrativo) el 20 de noviembre de 2007. Mediante la referida resolución, el D.A.C.O. declaró con lugar la querella presentada por el Sr. Israel Pérez Rivera (el recurrido) y decretó la nulidad del contrato de compraventa al determinar que el recurrente incurrió en dolo grave al ocultar información esencial al recurrido para inducirlo a celebrar un contrato que no hubiera otorgado de haber conocido dicha información. También ordenó la restitución recíproca de las correspondientes prestaciones, dentro de un término de treinta (30) días. El recurrente debía reembolsar al recurrido la cantidad de seis mil quinientos veinte dólares ($6,520.00) por concepto de adelanto, más veintiocho mil ochocientos noventa y nueve dólares ($28,899.00) por concepto de cincuenta y siete (57) mensualidades, a razón de quinientos siete dólares ($507.00), ambas cantidades con sus intereses. Así, también el D.A.C.O. ordenó al recurrente el pago de mil quinientos dólares ($1,500.00) en concepto de honorarios de abogado, además, a realizar las gestiones pertinentes a los fines de liberar al recurrido del contrato de préstamo e hipoteca otorgado con RG Premier Bank (RG), así como de liberar su crédito. En cuanto a RG, desestimó la querella por no existir contra ella una causa de acción que justificara la concesión de un remedio.

Luego de estudiado los hechos, el derecho aplicable, así como la transcripción de los testimonios vertidos en las vistas, se confirma la resolución recurrida.

Los hechos e incidencias procesales más importantes son las que expondremos a continuación.

El recurrido presentó querella ante el D.A.C.O., el 15 de junio de 2004 en contra del recurrente y RG. En dicha querella, alegó que el 4 de septiembre de 2001, había otorgado una escritura de compraventa con el recurrente, en la que adquirió el lote número dos (2) del Proyecto Estancias La Sierra (III) en Aguas Buenas, con el único propósito de construir una residencia. Véase transcripción pág. 32, líneas 24-30; y la resolución recurrida.

Surge, además, que el recurrido compró el terreno por sesenta y cinco mil quinientos veinte dólares ($65,520.00). De dicha cantidad, el recurrido le adelantó al recurrente seis mil quinientos veinte dólares ($6,520.00); éste indicó, además, que el financiamiento fue a través de RG por un término de siete (7) años para pagar quinientos doce dólares con cuatro centavos ($512.04). Luego quedaría un pagaré de cuarenta y ocho mil dólares que refinanciar para saldar la deuda. Transcripción, págs. 30-31.

Además, alegó haber pagado $512.04 por cincuenta y siete (57) meses y que al presente no ha continuado pagando dicha cantidad, así se desprende de las determinaciones de hechos y de la Transcripción, pág.31, líneas 11-19.

No obstante, en noviembre de 2003, acudió ante la Administración de Reglamentos y Permisos (ARPE) en Bayamón para orientarse y poder realizar los trámites para conseguir los permisos de construcción correspondientes. Allí le indicaron que no se estaban otorgando permisos para construir en esa área porque *"estaban en un proceso con Recursos Naturales"*, Transcripción, pág. 34, líneas 10-13. Se percató que el terreno que había adquirido se encontraba en un área cársica, protegida por el Departamento de Recursos Naturales y Ambientales (DRNA); además, el área poseía yacimientos arqueológicos que podían afectarse de llevarse a cabo un proyecto de construcción. Además, tuvo conocimiento de la existencia de una disputa ambiental por el potencial peligro de que dicho proyecto afectara los depósitos acuíferos del Río Caguitas y las Cuevas de Aguas Buenas.

Es importante mencionar que, el 19 de octubre de 2002, se aprobó la Ley Núm. 245 que convirtió en reserva natural la zona en que ubica el Proyecto Estancias La Sierra III, lo que provocó que el recurrente presentara una demanda de expropiación a la inversa, que todavía está pendiente en los tribunales.

Según se desprende de los documentos que obran en el expediente, el DRNA había incoado una querella contra el recurrente y otras personas. Sin embargo, las partes suscribieron un acuerdo que pondría fin a la controversia.

En el acuerdo transaccional que el recurrente y el DRNA otorgaron el 11 de junio de 2001, el cual no sería vinculante hasta que el Secretario del DRNA le impartiera aprobación final, se estipuló lo siguiente:

*"1. Ramírez & Co. acordó traspasar al DRNA una faja de alrededor de diez cuerdas de terreno, que sería destinada a un bosque pasivo;*

*2. Ramírez & Co. acordó constituir una servidumbre de conservación a perpetuidad a favor del DRNA en el remanente de la finca; dicha servidumbre prohibiría canteras o extracciones comerciales de minerales o componentes de la corteza terrestre, usos industriales y proyectos de urbanización o lotificación;*

*3. El DRNA se reiteró en el endoso al proyecto residencial Estancias de la Sierra III, sujeto al cumplimiento de las condiciones de estas estipulaciones."*

Es pertinente señalar que, el aludido litigio entre el recurrente y el DRNA, activo desde el año 1999 hasta el 2004, se encuentra en suspenso, toda vez que se decretó un archivo sin perjuicio en el mismo.

Ante dicha situación, el recurrido se enteró que el 4 de febrero de 2002, ARPE prohibió la autorización de permisos en la Urb. Estancias La Sierra III y presentó querella ante el D.A.C.O., el 15 de junio de 2004.

Adujo que ante tal situación se había visto imposibilitado de construir la residencia. Alegó, además, que el recurrente y RG tenían conocimiento de tal situación ANTES del otorgamiento de la compraventa e hipoteca y que estas prohibiciones, no le fueron expresadas al recurrido al momento de éste consentir a adquirir la propiedad. El recurrido solicitó lo siguiente: a) la resolución del contrato de compraventa e hipoteca; b) la indemnización de todo gasto y daño de naturaleza contractual ocasionado por las firmas recurrentes; c) la indemnización de daños y perjuicios por las angustias mentales, por una cantidad no menor de $25,000.00, y d) costas y honorarios de abogado por $5,000.00.

El 11 de mayo de 2005, RG presentó contestación a la querella. En la misma, en síntesis, adujo que compareció en la escritura como acreedor hipotecario y que el mismo día advino como acreedor hipotecario del solar, cuando el recurrido otorgó escritura de hipoteca con ellos. Además, como parte de las estipulaciones de hechos, surge que RG compró el pagaré en fecha posterior a que se otorgara la compraventa, ya que no fue la institución quien en sus orígenes otorgó el financiamiento del préstamo hipotecario. Transcripción, pág. 18, líneas 26-30.

El 8 de julio de 2005, RG presentó querella contra co-parte en la que expresó que intervino en el caso a los únicos efectos de financiar el préstamo hipotecario para la adquisición del solar. En relación a los daños alegados por el recurrido indicó que éstos, de ser ciertos, fueron ocasionados por las actuaciones u omisiones de la recurrente, sobre los cuales RG no tenía control ni responsabilidad.

Por otro lado, la recurrente contestó ambas querellas el 10 de mayo de 2006. En la querella alegó lo siguiente: que el D.A.C.O. no tenía jurisdicción para atender la querella presentada; que habían segregado y vendido el predio de terreno luego de obtener todos los permisos de las diferentes agencias del Estado Libre Asociado de Puerto Rico (ELA), incluyendo al DRNA; que prepararon un plano de inscripción, el cual fue sometido ante ARPE y fue aprobado, y que al momento de la compraventa del terreno no existía querella y/o controversia alguna ante el DRNA que afectara, impidiera o limitara la transacción de compraventa realizada entre las partes y/o afectara el título, así como el libre disfrute de la propiedad que ostentan los recurridos sobre el referido inmueble.

En la contestación a la querella contra co-parte, el recurrente adujo que no existía relación contractual alguna al momento de instarse la querella original con RG.

Luego de varios incidentes procesales, las vistas se llevaron a cabo el 19 de enero, 12 de febrero y el 18 de mayo de 2007, respectivamente. Es importante señalar, que al momento de celebrarse la vista administrativa ante el D.A.C.O., todavía el Secretario del DRNA no había aprobado la transacción, por lo que la misma no era vinculante; así se desprende del testimonio del Lcdo. José M. Tous Cardona, Abogado de la Oficina de Asuntos Legales del DRNA. Transcripción, págs. 66 y 70, líneas 16-26 y 25-32, respectivamente.

Por parte del recurrido compareció el Lcdo. José A. Tous Cardona (Lcdo. Tous), Abogado III de la Oficina de Asuntos Legales del DRNA.

De otra parte, comparecieron como testigos del recurrente, el socio gestor, el Sr. Pedro Ramírez Soltero y el Ing. Habriel Rodríguez, Director de la Oficina Regional de ARPE de Bayamón.

El recurrido presentó su testimonio y, en síntesis, declaró que compró el Solar Núm. 2 de Estancias La Sierra III con el único propósito de construir una vivienda; que en ningún momento antes de otorgar el contrato de compraventa, el recurrente le indicó que había una querella pendiente ante el DRNA, que se enteró de los

conflictos existentes cuando visitó a ARPE para orientarse y que si llegaba a saber que existían problemas con dichos terrenos no lo hubiese comprado. Además, indicó que no había llamado o visitado al DRNA para verificar la información recibida, ni visitó ni llamó a las oficinas del recurrente para corroborar la información. Transcripción, págs. 30-57.

Por otro lado, el Lcdo. Tous, en síntesis, declaró que había presentado querella contra Ramírez & Co. y otros, en el 1999. En dicha querella, el DRNA alegó que se había hecho un movimiento de componentes de corteza terrestre, corte de árboles, además, de haberse construido unos puentes por encima de unos cuerpos de agua sin autorización del Departamento. Expresó, además, que luego de varios trámites procesales, las partes decidieron presentar una transacción para que pusiera fin a dicha querella, pero que la misma no es vinculante ni le puso fin a la controversia por no ser aprobada por el Secretario del DRNA.

Por su parte, el Ing. Habriel Rodríguez Pacheco, ingeniero adscrito a la Oficina Regional de ARPE de Bayamón, en síntesis, declaró que hubo instrucciones para *"aguantar"* los permisos para la Urb. Estancias La Sierra III hasta tanto se aclarara la situación de conflictos con ciertos endosos. Transcripción, pág. 93, líneas 13-25.

Por último, el Sr. Juan F. Ortega Arocho, socio del recurrente, en lo pertinente, declaró que tenía conocimiento de la querella que el DRNA había presentado en contra del recurrente y que el acuerdo que pondría fin a la misma, con fecha de 11 de junio de 2001, no había sido firmado por el Secretario del DRNA, por lo que no daba por terminado el pleito. Además, aceptó que al momento de la compraventa efectuada por el recurrido, el 4 de septiembre de 2001, la querella presentada no se había solucionado y que esta situación no se le informó a los demás compradores, por entender que no era necesario.

El 20 de noviembre de 2007, el D.A.C.O. emitió resolución en la que declaró Con Lugar la querella presentada por el recurrido. El D.A.C.O. concluyó que el consentimiento otorgado por el recurrido en este caso fue uno viciado, por haberse obtenido mediante el dolo grave en que incurrió el recurrente, por lo que decretó la nulidad del contrato y su resolución retroactiva. Determinó que el recurrente, engañosamente, ocultó información esencial al recurrido para inducirlo a celebrar un contrato que no hubiera otorgado de haberla conocido. Por lo que ordenó que dentro del término de treinta (30) días, contados a partir de la notificación de la resolución, las partes se restituirían recíprocamente las correspondientes prestaciones. El recurrente debía reembolsar al recurrido la cantidad de seis mil quinientos veinte dólares ($6,520.00) por concepto de adelanto, más veintiocho mil ochocientos noventa y nueve dólares ($28,899.00) por concepto de cincuenta y siete (57) mensualidades, a razón de quinientos siete dólares ($507.00), ambas cantidades con sus intereses. Así, también el D.A.C.O. ordenó al recurrente el pago de mil quinientos dólares ($1,500.00) en concepto de honorarios de abogado, además, a realizar las gestiones pertinentes a los fines de liberar al recurrido del contrato de préstamo e hipoteca otorgado con RG Premier Bank (RG), así como de liberar su crédito. Con relación a RG, el D.A.C.O. determinó que no obraba en el expediente administrativo evidencia ni reclamo de actuación indebida o ilegal, sino la solicitud de la parte recurrida en cuanto a que se resolviera la hipoteca, por lo que desestimó la querella en cuanto a esta parte.

No conforme con dicha determinación, el recurrente presentó un recurso de revisión judicial ante este Tribunal y señaló los siguientes errores:

*"A. Erró el D.A.C.O. al declararse con jurisdicción cuando no la tenía.*

*B. Erró el D.A.C.O. en la apreciación de la prueba al concluir que la recurrente cometió actuaciones dolosas al momento de otorgar el contrato de compraventa y, por tanto, hubo vicios en el consentimiento.*

*C. Erró el D.A.C.O. al imponer honorarios de abogado por temeridad al recurrente."*

En su escrito, el recurrente adujo que el D.A.C.O. no tenía jurisdicción sobre la materia, ya que un supuesto vicio de consentimiento debido a dolo no estaba contemplado o incluido como una práctica indeseable de construcción. Además, alegó que a la fecha de la consumación del contrato de compraventa en septiembre de 2001 no existía litigio alguno en el DRNA, por lo que no hubo vicio en el consentimiento al no indicarle que había habido una querella ante el DRNA, e indicó que lo que había sido objeto de querella y había sido resuelto no afectaba el solar del recurrido. Añadió, además, que si el recurrido no había construido la residencia que deseaba construir era porque no había cumplido con los requerimientos de ley en el sentido de obtener los permisos de construcción necesarios para ello.

Transcurrido el término correspondiente, la parte recurrida no ha presentado su alegato con respecto al recurso presentado. Por tanto, procedemos a resolver sin el beneficio de su comparecencia.

## II

### A. Ley Núm. 130 de 13 de junio de 1967, según enmendada

En primer término debemos señalar que el D.A.C.O. tiene la facultad para poner en vigor y hacer cumplir las disposiciones de la ley orgánica de la Oficina del Oficial de Construcción por virtud de la Ley Núm. 130 de 13 de junio de 1967, según enmendada, y aplicar el reglamento adoptado para evitar las prácticas indeseables en el negocio de la construcción de viviendas en Puerto Rico. 17 L.P.R.A. sec. 501-519. El propósito de dicha legislación es reglamentar las actividades de urbanizadores y constructores que se dediquen al negocio de la construcción de viviendas, en todas las etapas, inclusive la venta de las viviendas. *United Fed. Savings v. D.A.C.O.*, 111 D.P.R. 424, 426 (1981). Entre sus funciones se destaca, por su pertinencia al recurso de autos, que *"investigará y adjudicará querellas sobre prácticas indeseables o cualquier violación a las disposiciones de este capítulo que se traigan ante su consideración, concediendo los remedios pertinentes conforme a derecho."* 17 L. P.R.A. sec. 504 (g).

El contrato uniforme de compraventa es reglamentado por el D.A.C.O., a tenor con lo dispuesto por la Ley Número 130, *supra*, y el *"Reglamento para Regular las distintas Actividades que se Llevan a Cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico"*, promulgado por el D.A.C.O. al amparo de la misma, el 17 de agosto de 1977, Reglamento Núm. 2268.

El Art. 1 (d) de la Ley Núm. 130, *supra*, 17 L.P.R.A. sec. 502 (d), define *urbanizador o constructor* como toda persona que se dedique al negocio de la construcción en calidad de empresario o principal responsable de la promoción, diseño, venta, construcción de obras de urbanización para vivienda, o de la construcción en grande escala de viviendas, bien del tipo individual o multipisos; además, incluye a quien asuma la responsabilidad total para la presentación ante la Junta de Planificación de consultas de ubicación y uso de terrenos, y ante ARPE del desarrollo preliminar, planos preliminares y finales para la construcción de las obras en un predio extenso de terreno que habrá de notificarse para la construcción de viviendas, incluye a quien desarrolle parcelas o lotes de terreno en número mayor que el permitido como lotificación simple según las leyes y reglamentos de la Junta de Planificación o de ARPE, en un número mayor de veinte (20) como un sólo proyecto.

Por otro lado, el Reglamento Núm. 2268, sec. 1 (f), define *urbanizador* y/o *constructor*, entre otras, a quien asuma la responsabilidad total para la presentación ante la Junta de Planificación de consultas de ubicación y uso de terrenos, desarrollo preliminar, planos preliminares y finales para la construcción de las obras en un predio extenso de terreno que habrá de notificarse para la construcción de viviendas.

La Ley Núm. 130, *supra*, dispone como práctica indeseable en el negocio de la construcción de viviendas, el que un urbanizador o constructor:

*"a. Publique, haga publicar, o divulgue, en cualquier forma, anuncios, declaraciones o informaciones en las que se tergiversen o exageren los términos bajo los cuales se puedan adquirir solares o unidades de vivienda u ofrezca informaciones o cálculos falsos o engañosos en cuanto al precio u otras condiciones para la adquisición de solares o unidades de vivienda.*

*b. Solicite o acepte depósitos o anticipos en dinero para la reserva de unidades de vivienda en proyectos cuyo desarrollo preliminar o planos preliminares, no hayan sido previamente aprobados por la Junta de Planificación, salvo cuando dichos anticipos o depósitos sean con el propósito del tanteo del mercado para conocer la intensidad de la demanda y el mismo sea una cantidad nominal que no exceda de veinticinco (25) dólares.*

*c. Altere o modifique los planos de una vivienda o modelo aprobado por la Junta de Planificación y/o la Administración de Reglamentos y Permisos, disponiéndose que toda solicitud que enmiende los planos o especificaciones del proyecto radicada ante la Junta de Planificación y/o la Administración de Reglamentos y Permisos deberá estar precedida de un aviso cursado por el urbanizador o constructor a los optantes y/o compradores, mediante correo certificado con acuse de recibo con por lo menos veinte (20) días de antelación al a radicación de las enmiendas allí solicitadas."* 17 LPRA § 509.

Asimismo, el Reglamento 2268, promulgado por el D.A.C.O., prescribe en su Sección 10 las prácticas indeseables para el negocio de la construcción. Así también prescribe, cuáles son las cláusulas que debe contener dicho contrato y exige que el contrato a utilizarse sea sometido previamente al D.A.C.O. para su aprobación. A tenor con la reglamentación vigente, el D.A.Co. había prescrito el contenido de dicho contrato, haciendo formar parte del Reglamento un modelo uniforme para el mismo.

Por su parte, el Art. 11 de la Ley Núm. 130, *supra,* dispone en lo pertinente, que cualquier comprador de una vivienda podrá radicar en el Departamento de Asuntos del Consumidor una querella alegando que el urbanizador o constructor de su vivienda ha incurrido en una práctica indeseable de construcción o ha violado alguna de las disposiciones de la ley.

## B. Contratos y Vicio en el Consentimiento

En Puerto Rico rige el principio de la libertad de contratación. *Unisys Puerto Rico, Inc. v. Ramallo Brothers,* 128 D.P.R. 842, 850 (1991). Como parte de esta norma, *"los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público".* Art. 1207 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3372.

Una vez establecidas las cláusulas y condiciones del acuerdo, se entenderá perfeccionado el contrato por el consentimiento entre las partes y desde ese momento cada una de ellas vendrá obligada no sólo a cumplir con lo expresamente pactado, sino también con las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3375. Esa obligación de cumplir con lo pactado se funda en el principio de la buena fe, el cual exige no defraudar la confianza que otro ha puesto en una promesa o conducta. *Unisys v. Ramallo Brothers, supra,* (citando a L. Díez-Picazo, *Fundamentos de Derecho Civil Patrimonial,* 2<sup>da</sup> ed., Madrid, Ed. Tecnos, 1983, Vol. I, Cap. IV, pág. 99).

El consentimiento de las partes es uno de los elementos esenciales que debe concurrir para la existencia de todo contrato. El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras a dar alguna cosa o prestar algún servicio. Ahora bien, dicho consentimiento supone la concurrencia de ciertos presupuestos necesarios para su validez y eficacia, entre ellos, la declaración de la voluntad libre de vicios. *García Reyes v. Cruz Auto Corp.,* **2008 J.T.S. 112**, 173 D.P.R. ___ (2008).

De acuerdo con el Art. 1217 del Código Civil de Puerto Rico, dicho consentimiento será nulo si éste fuere prestado por error, violencia, intimidación o dolo. 31 L.P.R.A. sec. 3404. Existe dolo que invalida el consentimiento cuando una parte es inducida a celebrar un contrato mediante maquinaciones insidiosas. *Pérez v. Morales,* **2007 J.T.S. 176**, 172 D.P.R. ___ (2007). **Constituye dolo ocultarle a la parte compradora la existencia de una circunstancia importante respecto al objeto del acuerdo.** (Énfasis nuestro) *Bosques v. Echevarría,* 162 D.P.R. 830, 836 (2004). El dolo implica todo un complejo de malas artes, contrario a la honestidad e idóneo para sorprender la buena fe ajena, generalmente para beneficio propio, en que viene a reunirse el estado de ánimo de aquel que no sólo ha querido el acto, sino que además, ha previsto y querido las consecuencias antijurídicas provenientes de él. Es la voluntad consciente de producir un acto injusto. *Pérez v. Morales, supra; Colón v. Promo Motor Imports, Inc.,* 144 D.P.R. 659, 666 (1997).

El dolo puede manifestarse al momento de la contratación o, posteriormente, en la consumación del contrato. *Mayagüez Hilton Corp. v. Betancourt,* 156 D.P.R. 234, 252-253 (2002). El dolo no se presume. No obstante, como cualquier otro elemento mental, no tiene que ser establecido directamente, sino que puede inferirse de las circunstaneias presentes en el caso en particular. *García Reyes v. Cruz Auto Corp., supra; Pérez v. Morales, supra; Colón v. Promo Motor Imports, Inc., supra,* a la pág. 669.

Sin embargo, no todo tipo de dolo produce la nulidad de un contrato. A tales efectos, el Art. 1222 del Código Civil de Puerto Rico, *supra,* dispone que para que el dolo produzca la nulidad de los contratos, deberá ser grave y no haber sido empleado por las dos partes contratantes. De tal modo que afecta el consentimiento que inspira y persuade al contratante. Este dolo grave se ha denominado como el dolo causante. 31 L.P.R.A. sec. 3409.

Existe otra especie de dolo, denominado por el Art. 1222 del Código Civil de Puerto Rico, *supra,* como dolo incidental, cuya existencia no produce la nulidad del contrato. Este tipo de dolo no tiene una influencia decisiva en la esencia de la obligación, sino que facilita la celebración del contrato. En el dolo incidental, contrario al dolo causante, existe la voluntad de contratar del perjudicado, pero hay engaño en el modo en que se celebra el contrato. Sin éste, el contrato de todas formas se hubiera celebrado, pero no bajo las mismas condiciones. *García Reyes v. Cruz Auto Corp., supra; Colón v. Promo Motor Imports, Inc., supra,* a la pág. 667. Cualquier engaño con respecto a dichas condiciones no acarrea, por si sólo, el consentimiento en la totalidad de la obligación, sino en algún extremo o particularidad de ella. El dolo incidental sólo obliga al que lo empleó a indemnizar en daños y perjuicios.

Por tanto, de mediar alguno de estos factores que vicien el consentimiento, la parte afectada cuenta con una acción para solicitar la nulidad del contrato, la cual puede ser ejercitada dentro de un período de cuatro años, contados a partir de la consumación del contrato o desde que haya cesado la violencia o intimidación contra dicha parte. *Pérez v. Morales, supra.*

Una vez decretada la nulidad de una obligación, los contratantes deben restituirse recíprocamente las cosas que hubiesen sido materia del contrato, con sus frutos y el precio con sus intereses. *García Reyes v. Cruz Auto Corp., supra.*

## C. Revisión Judicial

La revisión judicial de las decisiones administrativas tiene como fin primordial limitar la discreción de las agencias y asegurarse que éstas desempeñen sus funciones conformes a la ley. *García Reyes v. Cruz Auto Corp., supra; Mun. de San Juan v. J.C.A.,* 149 D.P.R. 263 (1999). Por lo general, éstas gozan de gran deferencia y respeto de parte de los tribunales. *Municipio de San Juan v. Junta de Planificación,* **2006 J.T.S. 164**, 169 D.P.R. ____ (2006). Esto se fundamenta en la vasta experiencia y el conocimiento especializado que poseen organismos administrativos sobre los asuntos que estatutariamente se les ha

encomendado. *Empresas Ferrer. v. A.R.P.E.*, **2007 J.T.S. 181**, 172 D.P.R. ___ (2007).

Debido a que las decisiones administrativas tienen a su favor la presunción de legalidad y corrección, reiteradamente hemos sostenido que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto. Por esta razón, debemos ser bien cautelosos al intervenir con dichas determinaciones. *García Reyes v. Cruz Auto Corp., supra.*

El proceso de revisión judicial comprende tres (3) áreas: (1) la concesión del remedio, (2) la revisión de las determinaciones de hechos conforme al criterio de evidencia sustancial; y (3) la revisión de las conclusiones de derecho. El récord administrativo constituirá la base exclusiva para la acción de la agencia en un procedimiento adjudicativo y para la revisión judicial ulterior.

En el ejercicio de su función revisora, es importante que los tribunales consideren las determinaciones de hechos y conclusiones de derecho consignadas en una determinación administrativa. *Mun. de San Juan v. J.P., supra.* Esto permite cotejar si el organismo administrativo cumplió cabalmente su responsabilidad legal y si además fundamentó la determinación objeto de revisión. *Hernández v. Centro Unido,* **2006 J.T.S. 140**, 168 D. P.R. __ (2006). Estas determinaciones deben reflejar que se consideraron y resolvieron los conflictos de prueba y además, deben describir tanto los hechos probados como los rechazados. La expresión de los fundamentos de una decisión no puede ser pro forma, y debe reflejar que la agencia ha cumplido con su obligación de evaluar y resolver los conflictos de prueba del caso ante su consideración. *Mun. de San Juan v. J.C.A., supra.*

Consignar adecuadamente determinaciones de hechos y conclusiones de derecho permite que: (1) los tribunales tengan la oportunidad de revisar adecuadamente la determinación administrativa ante su consideración; (2) fomenta que los organismos administrativos adopten decisiones cuidadosas y razonadas conforme el ámbito de su autoridad y discreción; (3) ayudan a la parte afectada a entender la razón de la determinación administrativa, permitiendo así que ésta decida si solicita o no su revisión ante el foro apelativo correspondiente o si, de lo contrario, acata la misma; (4) promueve la uniformidad intraagencial, en particular cuando el proceso decisorio institucional es adoptado por distintos miembros de un comité especial a quienes les está encomendado celebrar vistas y recibir la prueba; y (5) evita que los tribunales usurpen funciones propias de las agencias administrativas, dado su conocimiento o *expertise. Empresas Ferrer, Inc. v. A.R.P.E., supra.*

La sección 4.5 de la Ley de Procedimiento Administrativo Uniforme (L.P.A.U.), 3 L.P.R.A. sec. 2175, estipula que las determinaciones de hechos de las agencias administrativas serán sostenidas si están fundamentadas por evidencia sustancial que obre en el expediente administrativo considerado en su totalidad. *Empresas Ferrer, Inc. v. A.R.P.E., supra; Hernández v. Centro Unido, supra.*

En cuanto a las conclusiones de derecho, la L.P.A.U. dispone que éstas pueden ser revisadas en todos sus aspectos por el tribunal. 3 L.P.R.A. sec. 2175. No obstante, los tribunales deben concederle deferencia. Más aún, los tribunales podrán sustituir el criterio de la agencia por el suyo únicamente cuando no encuentren base racional para explicar la determinación administrativa. *Empresas Ferrer v. A.R.P.E., supra; P.C.M.E. v. J.C.A.,* **2006 J.T.S. 7**, 166 D.P.R. ___ (2006).

No obstante, las conclusiones de derecho son revisables en todos sus aspectos. Esto no significa, sin embargo, que al ejercer su función revisora, el tribunal pueda descartar libremente las conclusiones e interpretaciones de la agencia, sustituyendo el criterio de ésta por el propio. Al contrario, hemos reiterado consistentemente antes y después de la vigencia de la L.P.A.U que, de ordinario, los tribunales deben deferencia a las interpretaciones y conclusiones de los organismos administrativos. Si de la totalidad del récord administrativo se sostienen las determinaciones adoptadas por el foro administrativo, los tribunales no deben sustituirlas por su propio criterio.

La deferencia judicial reconocida a las decisiones de agencias administrativas cede ante instancias

apropiadas y meritorias, como resulta ser cuando: (1) la determinación administrativa no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o reglamentos que se le ha encomendado administrar; (3) cuando actúa arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional; o (4) si la actuación administrativa lesiona derechos constitucionales fundamentales. *Empresas Ferrer Inc. v. A.R.P.E., supra.*

Finalmente, sobre este tema, el foro judicial podrá sustituir el criterio de la agencia por el propio **sólo en aquellas ocasiones que no encuentre una base racional que fundamente la actuación administrativa**. No obstante, es axioma judicial que ante la prueba pericial y documental, el tribunal revisor se encuentra en igual posición que el foro recurrido y, por tanto, está facultado para apreciar la prueba apoyándose en su propio criterio.

Por otro lado, es sabido que las agencias administrativas pueden imponer honorarios de abogado bajos las mismas circunstancias que bajo la Regla 44 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44; Sec. 3.21 de la LPAU, 3 L.P.R.A. sec. 2170a (c).

Es norma reiterada que la imposición de honorarios de abogado sólo procede cuando una parte ha actuado con temeridad o frivolidad. Al respecto, hemos expresado que el propósito de la determinación de temeridad y la eventual imposición de honorarios de abogado es *"penalizar al litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajo e inconveniencias de un pleito"*. *O. E. G. v. Román*, 159 D.P.R. 401 (2003); *Domínguez v. GA Life, Inc.*, 157 D.P.R. 690 (2002).

La imposición de honorarios descansa en la sana discreción de la agencia administrativa. Es norma establecida que este Tribunal no intervendrá con este tipo de determinación en ausencia de un claro abuso de discreción. *Quiñones v. San Rafael Estates, S.E.*, 143 D.P.R. 756, 777 (1997).

## III

Examinemos los errores señalados bajo la normativa antes esbozada.

Arguye el recurrente, en el primer error, que el D.A.C.O. carecía de jurisdicción para atender el caso, ya que los vicios en el consentimiento por dolo no están contemplados o incluidos como una práctica indeseable de construcción bajo la referida Ley Núm. 130, *supra,* o el Reglamento Núm. 2268, *supra*. Dicha parte alega, además, que en ningún momento, el recurrido especificó en la querella o durante la vista administrativa una práctica desleal o una violación a las disposiciones del Reglamento Núm. 2268, *supra.*

No le asiste la razón, veamos porqué.

La Ley Núm. 130, *supra,* le confiere jurisdicción al D.A.C.O. para atender querellas presentadas por consumidores contra *"urbanizadores o constructores"*. Si tomamos como base la definición que esta ley hace en cuanto a *"urbanizadores o constructores",* podemos concluir que el recurrente es un urbanizador o constructor, porque fue la entidad que **desarrolló** las parcelas o lotes de terreno en un número mayor de veinte (20) como un sólo proyecto. Además, dicha parte fue la que asumió la responsabilidad de la presentación ante ARPE de la consulta de ubicación y uso de terrenos para el desarrollo preliminar. Véase Apéndice 19 de la Revisión Judicial. Según se desprende de los documentos que obran en el expediente, el Proyecto Estancias La Sierra III se compone de 49 solares, por lo que entendemos que le es aplicable la Ley Núm. 130, *supra.*

El Departamento de Asuntos del Consumidor fue creado con el fin primordial de vindicar e implementar los derechos del consumidor, Ley Núm. 5 de 23 de abril de 1973, según enmendada. 3 L.P.R.A sec. 341 *et seq*. En sintonía con lo anterior, la ley habilitadora del D.A.C.O. le confirió a su Secretario la facultad de atender,

investigar y resolver las quejas y querellas presentadas por los consumidores de bienes y servicios adquiridos o recibidos en el sector privado de la economía. 3 L.P.R.A. sec. 341e(c). En aras de vindicar eficazmente los derechos de los consumidores, el D.A.C.O. posee una estructura de adjudicación administrativa con plenos y amplios poderes para adjudicar las querellas ante su consideración, y conceder los remedios pertinentes conforme a derecho. 3 L.P.R.A. sec. 341e (d). *Amieiro v. Pínchale Real Estate,* **2008 J.T.S. 73**, 173 D.P.R. ___ (2008). Por lo tanto, es forzoso concluir que el D.A.C.O. tenía jurisdicción para atender dicha querella, conforme a la Ley Núm. 130 y la Ley Núm. 5, *supra.*

En cuanto al segundo error, el recurrente alega que incidió el D.A.C.O. en la apreciación de la prueba al concluir que dicha parte había cometido actuaciones dolosas al momento de otorgar el contrato. El D.A.C.O. determinó que el recurrente le ocultó información esencial al recurrido para inducirlo a celebrar un contrato que no hubiera otorgado de haber conocido dicha información, por lo que resolvió que el consentimiento prestado por el recurrido fue uno viciado.

No le asiste la razón al recurrente, veamos porqué.

Cuando las partes establecen las cláusulas y condiciones del contrato, se entenderá perfeccionado el mismo, por el mero consentimiento entre las partes. El consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato. Artículo 1214 del Código Civil de Puerto Rico, 31 L.P.R.A. 3401.

El consentimiento es uno de los elementos esenciales del contrato, por lo tanto, **será nulo si es prestado por error, violencia, intimidación o dolo.**

El dolo es un engaño que influye sobre la voluntad de una parte para la celebración de un contrato. Para que produzca la nulidad del contrato, el dolo debe ser grave, es decir, aquel que determina el consentimiento, que inspira y persuade a contratar, sin el cual no se hubiera efectuado el contrato. *Colón v. Promo Imports, supra.*

En el caso de autos, el D.A.C.O. determinó que el recurrente incurrió en dolo grave al momento de otorgar el contrato al no informarle al recurrido la existencia de una querella en el DRNA que afectaba el endoso que había otorgado dicha agencia al Proyecto Estancias La Sierra III. El recurrente, además, sabía que la transacción no había sido aprobada por el Secretario del DRNA, por lo que la misma no era vinculante. A pesar de esta situación, el recurrente procedió a otorgar el contrato uniforme de compraventa con el recurrido para venderle el Lote Número 2 en la susodicha urbanización, el 27 de agosto de 2001.

Por otro lado, surge del testimonio del Sr. Juan F. Ortega Arocho, socio de Ramírez, que éste tenía pleno conocimiento de la querella pendiente en el DRNA en contra del recurrente. Este declaró que no les informó a los compradores de los problemas que estaba confrontando el Proyecto Estancias La Sierra III y que el caso no se había solucionado, ya que las estipulaciones que otorgaron las partes no fueron firmadas por el Secretario del DRNA, por lo que el acuerdo no era vinculante y no ponía fin al pleito.

En lo pertinente, citamos estos extractos de la transcripción, página 116, líneas 11-35, y página 117, líneas 1-14:

Pág. 116

*"P-No recuerda tampoco. O sea, que hubo una querella, ustedes fueron a tratar de hacer un acuerdo con Recursos Naturales, firmaron un acuerdo, pero el -acuerdo nunca fue firmado por el Secretario de*

*Recursos Naturales.*

*R- Eso es así.*

*P- O sea, que la querella se quedó pendiente. Le pregunto al momento de la compraventa de mi representado, señor Israel, el 4 de septiembre de 2001, esa querella ya había sido incoada, ya había sido presentada.*

*R- Si.*

*P- Y al momento que ustedes vendieron la propiedad al señor Israel Pérez, ¿había solucionado la querella?*

*R- Entiendo que no.*

*...*

*...*

*...P-¿Qué información, si alguna, se"*

Pág. 117

*"1- le diò a esas persona, consumidores que estaban
2- comprando sobre los problemas que había con Recursos
3- Naturales?
4- R- En ese momento nosotros entendimos que no
5- había ningún problema porque una querella no para
6- ningún proyecto. Una querella, yo puedo tener veinte
7- querellas y mi proyecto sigue caminando.
8- P-Le solicito, por favor, que escuche...
9- ...¿Qué información,
10- si alguna, se le dio a los consumidores que estaban
11- comprando...?
12- R- Ninguna.
13- P- No se le informó nada sobre la querella.
14- R- Sobre esa querella, no."*

Según se desprende de la prueba que obra en el expediente, así como del testimonio vertido por el recurrido, surge claramente que éste compró el solar en disputa, **con el único propósito de construir una vivienda y que de conocer que existía un pleito legal entre DRNA y Ramírez no lo hubiese comprado.** (Énfasis nuestro)

En lo pertinente, citamos la siguiente porción del testimonio del recurrido, páginas 32-33 de la Transcripción, líneas 22-35, y página 33, líneas 3-6:

Pág. 32

*"22- ... ¿Don Israel, con qué
23- propósito usted compró esta propiedad?
24- R- Esa propiedad yo la compré con el propósito
25- de hacer mi casa en mi retiro ya que estoy trabajando
26- bastantes años y ahora mismo yo la compré con el
27- propósito de hacerme esa casa, ya que me quedan como
28- algunos cuatro años para yo retirarme con mi seguro
29- social y deseaba hacer mi casa en ese momento dado en*

*30- ese lugar.*
*31- **P-** ¿Y qué pasó?*
*32- **R-** Pues, no pude hacerlo porque cuando yo fui*
*33- en noviembre de 2003, fui a ARPE de Bayamón para*
*34- tomar una orientación para hacer la casa allí en ese*
*35- lugar porque ahí fue que me indicaron a mí que yo..."*

*Pág. 33*

*3- ... ya al principio cuando llegué allí*
*4- solamente me dijeron que ahí no se estaban dando*
*5- permiso[s] de construcción porque habían problemas con*
*6- Recursos Naturales."*

Por lo tanto, es forzoso concluir, al igual que el D.A.C.O. que el recurrente **engañosamente**, ocultó información esencial al recurrido para inducirlo a la celebración del contrato. El engaño recayó sobre un elemento esencial del contrato que fue el consentimiento. Quedó probado que dicha parte no hubiese otorgado el contrato de compraventa si hubiese conocido la disputa existente en cuanto a los endosos del DRNA en el susodicho proyecto, disputa que le ha impedido construir su residencia.

Entendemos que la determinación de la agencia está basada en la evidencia sustancial que obra en el expediente administrativo, por lo que no intervendremos con ellas.

Por último consideraremos el último error señalado por el recurrente, en cuanto a la imposición de honorarios de abogado por temeridad. Entendemos que no incurrió el D.A.C.O. en abuso de discreción al imponer los honorarios de abogado por temeridad.

En este caso, el recurrente actuó con temeridad al negar su responsabilidad en cuanto al engaño al recurrido sobre la existencia de alguna querella o controversia con el DRNA. Según se desprende de su contestación a la querella, el 10 de mayo de 2006, éste negó que existiera una querella o alguna controversia ante el DRNA que impidiera y/o limitara la transacción de compraventa realizada. Luego en la vista del 18 de mayo de 2007, el socio del recurrente, el Sr. Arocho, declaró que sí existía una querella, y que la misma estaba pendiente.

Por lo anterior, entendemos que el recurrente no nos ha puesto en la posición de concluir que la determinación de la agencia constituya un abuso de discreción, por lo que la sostenemos.

Cualquier actuación que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o que provoque que la otra parte incurra en gestiones evitables, amerita la condena de honorarios de abogado. *Fernández v. San Juan Cement Co. Inc.,* 118 DPR 713 (1987).

Cuando aplicamos la normativa antes citada al caso de autos, no podemos llegar a otra conclusión que no sea la de coincidir con la resolución del foro administrativo.

Es norma reiterada que debemos sostener las determinaciones de hechos de las agencias administrativas, si éstas están fundamentadas en la evidencia sustancial que obra en el expediente considerado en su totalidad; así surge en el caso de autos. Luego de examinado el mismo, podemos concluir que el D.A.C.O. no actuó de manera irrazonable ni arbitraria, por lo que confirmamos la resolución recurrida.

## IV
Por los fundamentos anteriormente esbozados, se confirma la resolución del D.A.C.O.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. María E. Pérez Ortiz
Secretaria del Tribunal de Apelaciones